BRADLEY J. CAMPBELL, Plaintiff-Appellant, *v.* NORTHERN SIGNAL
COMPANY *et al.*, Defendants-Appellees.

Fifth District    No. 80-177

Opinion filed December 29, 1981.

John Dale Stobbs, of Stobbs and Sinclair, Ltd., of Alton, for appellant.

Thomas O. Falb, of Reed, Armstrong, Gorman and Coffey, of Edwardsville, for appellee Evelyn Tiemann.

Robert W. Schmieder, of Wagner, Bertrand, Bauman and Schmieder, of Belleville, for appellees Northern Signal Company and Jerseyville Farm and Home Supply Company.

JUSTICE WELCH delivered the opinion of the court:

This case arises from a unique gasoline explosion and fire which occurred on August 14, 1975. That day, Bradley Campbell and his brothers, Brian and Bill, were at the farm of their grandmother, Evelyn Tiemann, in Godfrey, Illinois. Mrs. Tiemann's husband had passed away several months earlier and the Campbell boys, all of whom were then in their early to mid-teens, often assisted with farm chores. They were so engaged on the morning of August 14.

The Campbell boys had been instructed by their father to perform repair work on a livestock loading chute that day. To that effect, the three went to a large storage shed on the Tiemann farm to begin work. That shed, which was constructed of corrugated metal, was wired for electricity and was open on one side. When the Campbells arrived at the shed, they noticed a number of bumblebees flying in the area which they had selected as a work site. Bill and Brian could not identify the source of the bees, but Brad discovered that they were coming from a hole in the ground about 15 feet in front of the open side of the storage shed.

It was an established practice on the Tiemann farm to kill bumblebees by pouring gasoline on them. Observing this procedure, Brad filled a five-gallon plastic bucket three to four inches deep with gasoline from a container in the shed. He stepped over to the hole and began to pour the fluid. Almost instantaneously flames shot upward from the hole and engulfed Brad. He rolled in a nearby mud puddle to extinguish the fire on his body. Brian patted out the fire with a burlap sack, while Bill got a hose to use to spray Brad. Mrs. Campbell, who was in another nearby shed, came to Brad's assistance after she heard the boys' voices. Bill, Brian and Mrs. Campbell removed Brad's shirt, shoes, and trousers and washed him with water from the hose. Mrs. Campbell gave Brad a pair of cut-offs to wear and then brought him to the office of the family's physician.

The doctor recommended that Brad go to a hospital, so Mrs. Campbell took him to St. Joseph's Hospital in Alton. There, he was given morphine and valium to relieve pain and he was transported to the burn treatment facilities at St. John's Hospital in St. Louis. Brad was attended to by Nurse Cissy Condict at St. John's. In her admitting notes, Nurse

156

Condict reported that Brad told her that he had lit a match after pouring the gasoline and he came into the hospital in cut-offs because his long trousers were burned in the fire.

In 1976, suit was brought on Brad's behalf in the Circuit Court of Madison County. It sought compensation for his injuries from Mrs. Tiemann and from Jerseyville Farm and Home Supply Co. and Northern Signal Co., seller and manufacturer, respectively, of an electric fence charger called the "Blitzer Stock Stopper" (Blitzer) in use at the Tiemann farm. Against each defendant, the plaintiff asserted two theories of liability. The first theory against all defendants was *res ipsa loquitur*, while the second theory was based on the premise that the fire was caused by a spark produced by the Blitzer. Defendant Tiemann was said to be negligent in not properly maintaining the Blitzer, and in permitting Brad to use gasoline without her supervision. The complaint also alleged that the Blitzer was unreasonably dangerous because it produced sparks and because the Blitzer contained no warning about this tendency. The second theory of liability against defendants Northern Signal and Jerseyville Farm Supply was therefore in strict products liability.

The case proceeded to trial, which resulted in a jury verdict in favor of all three defendants. The plaintiff appeals and points to several rulings of the trial court which were alleged to have prejudiced him in the presentation of his case. The majority of his objections have to do with the admission of Nurse Condict's testimony. Specifically, the plaintiff argues that his statement that he lit a match should not have been admitted, because of his physical and mental condition when he first spoke to Nurse Condict. It is claimed that even if that statement had been properly admitted at trial, he should have been allowed to counteract it by calling an expert witness to testify on the effects of morphine and valium, by introducing Brad's long trousers to prove that they were not burned, contrary to Nurse Condict's report, and by having several instructions given to cure the prejudicial impact of the statement to Nurse Condict.

Other trial errors are alleged by the plaintiff. He states that the defendants should not have been permitted to introduce certain electrical codes and he should have been allowed to produce evidence of fires which had been caused by other Northern Signal products. The plaintiff also contends that the defense attorneys made several improper comments during closing arguments and that the jury was not appropriately instructed.

Under our view of the trial, we need not consider plaintiff's specific assignments of error. Even disregarding Nurse Condict's report in its entirety, we cannot see that the evidence presented at trial establishes a *prima facie* case against any defendant under any theory of liability alleged by the plaintiff. Consequently, according to the standards of

*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, the trial court should have directed a verdict in favor of all defendants.

■■■ To begin with the *res ipsa loquitur* counts, it should be noted that that doctrine allows an inference of negligence in certain circumstances where the alleged instrument of injury was shown to have been in the exclusive control of the party said to be negligent. (*Lynch v. Precision Machine Shop, Ltd.* (1981), 100 Ill. App. 3d 771, 427 N.E.2d 176; *Spidle v. Steward* (1980), 79 Ill. 2d 1, 402 N.E.2d 216.) The undisputed evidence in this case shows that neither Mrs. Tiemann nor any servant of Northern Signal or Jerseyville Farm Supply was present on the farm at the time of the accident. The sole eyewitnesses to the fire were the plaintiff and his two brothers. As a practical matter, the fact that Mrs. Tiemann owned the farm or that the other defendants sold and manufactured the Blitzer does not give any defendant a significant measure of control over the Blitzer or any other claimed cause of the fire. Since the evidence at trial suggests an insufficient degree of control by these defendants over the alleged instrumentalities of injury, this case is inappropriate to permit an inference of their negligence by the use of *res ipsa loquitur. Lynch v. Precision Machine Shop, Ltd.*

■■■ The evidence at trial also fails to establish Mrs. Tiemann's liability under those portions of the negligence count which aver that she did not supervise Brad in his use of the gasoline. This is because it was not shown that Mrs. Tiemann was under a duty to supervise Brad's activities. The law in this State does not generally require a landowner to watch over minors who are invited onto their property (*Bazos v. Chouinard* (1981), 96 Ill. App. 3d 526, 421 N.E.2d 566; *Bonamie v. Welsh* (1981), 95 Ill. App. 3d 349, 420 N.E.2d 243), and the evidence presented in this case provides no reason to hold Mrs. Tiemann to a higher standard of care. In fact, the presence of Mrs. Campbell in the vicinity of the accident when it occurred acts to reduce the level of conduct expected from Mrs. Tiemann. As the court stated in *Kay v. Ludwick* (1967), 87 Ill. App. 2d 114, 119, 230 N.E.2d 494, 497, "the primary responsibility for the safety of this minor child rested with its mother. That responsibility can be shifted to the host only if it may be said that the host is at fault under some recognized theory of liability." In other words, because Mrs. Campbell was on the farm, Mrs. Tiemann was not negligent for failing to supervise Brad, even though she could be liable for other acts or omissions. This, of course, brings us to the issues concerning the maintenance of the Blitzer and fence.

Under the remaining theories of liability against all defendants, the plaintiff must prove that the fire was caused by a spark produced by the Blitzer. That device operates according to fairly simple principles of elec-

tronics. The operator of the Blitzer must supply it with a 6-volt D.C. battery and must attach two wires to its terminals. One of these wires, the hot wire, is attached to the fence to be electrified. The hot wire should be insulated, as it was at the Tiemann farm. The second wire serves as a ground, and, according to Northern Signal literature, should be attached to a three-fourths inch diameter (or larger) galvanized pipe which should reach six feet underground.

When operating with a resistance of 500 ohms, which all expert witnesses agreed was a fair estimate for the average wire fence, the Blitzer would produce a voltage of approximately 10,000 volts for a duration of 1/4000 of a second. This pulse is produced about 50 times every minute. If an animal makes contact with the electrified fence, the current will run through its body, into the ground, and to the ground rod. This completes the circuit and shocks the animal.

The system will not work if the ground rod is not properly installed and connected, for then the circuit cannot be completed. Similarly, if conducting material makes contact both with the electrified fence and with the ground, the system will be shorted out and the fence will no longer shock animals which touch it. At the Tiemann farm, the fence was often shorted out by weeds or grass, or by dirt which the pigs pushed up against the fence. In fact, on the morning of August 14, the Campbell boys discovered that the system had been shorted out, so they walked the length of the fence and removed the weeds and dirt which rested against the fence.

Four expert witnesses testified about the properties of the Blitzer, one on behalf of the plaintiff and three for the defendants. Three of these witnesses agreed that, under a 500-ohm resistance, the Blitzer would generate sufficient voltage to create a spark at a gap of up to one-fourth inch along the completed circuit. In other words, if an animal came within one-fourth inch of the electrified fence, or if a gap of less than one-fourth inch existed in the wiring of the system or along the fence, a spark could be produced. The fourth expert witness could not produce a spark over a gap of one-sixty-fourth inch, but it is difficult to tell from the record how the resistance was set up on the test that he performed.

At the Tiemann farm, the Blitzer was located inside the shed at its northeast corner, at the junction of the north wall and the open east side. It was placed slightly more than four feet above ground level. Both the insulated hot wire and the bare ground wire went around the northeast corner post, the hot wire leading 20 feet past the shed to the electrified fence, and the ground wire connecting to the ground rod on the north side of the shed. A direct line from either the fence or the ground connection to the bee hole would therefore pass through the north wall of the shed. That north wall did not touch the ground, but the several-inch gap

between the ground and the bottom of the wall was usually obstructed by various materials which were stored in the shed.

Neither Mrs. Tiemann nor any member of the Campbells ever saw a spark produced by the Blitzer. The Campbells testified that they had seen sparks at intervals of up to one-fourth inch at the fence itself, although Mrs. Tiemann had not observed this phenomenon. Barbara Campbell and Mrs. Tiemann stated that they noticed nothing wrong with the ground wire, but Mr. Campbell and the boys remarked that the clamp which attached the ground rod to the ground wire was occasionally loose, and sparks had occurred when someone was close to the clamp. The three occurrence witnesses, Brad, Bill and Brian, stated that they did not notice any sparks from the Blitzer, its wires or the fence on the day of the accident.

All expert witnesses seemed to be in agreement about several general principles. The first of these is that gasoline fumes, being heavier than air, tend to stay close to the ground. The experts also stated that in order for combustion of gasoline fumes to occur, the ratio of those fumes to air must be between 1½ and 7½:100, by volume.

The three expert witnesses introduced by the defendants were of the opinion that the Blitzer and fence assembly could not have been the cause of the fire. The plaintiff's expert, physics professor Frederick Zurheide, was of a contrary view. He based his conclusions, in part, on a test which he had performed with the Blitzer. Professor Zurheide filled a garbage can lid with gasoline and set up a completed circuit with the Blitzer in such a way that a one-fourth inch gap in the circuit was created about three inches above the gasoline. It was discovered that, under these conditions, the gasoline fumes could be ignited. Professor Zurheide performed a similar second test, in which the gasoline was poured onto the ground. Again, the fumes were ignited. No test was conducted in which a spark was created at a distance of greater than three inches from the gasoline.

Professor Zurheide was questioned extensively on his opinion that the Blitzer or fence could have ignited the gasoline fumes. He admitted that he did not examine other possible causes, such as defective wiring or other loose electrical connections in the shed. He also opined that had the Blitzer or fence caused the fire, a flame would follow the fumes from the Blitzer or fence back to the source of the fumes, namely the bucket and the bee hole. The flames would not emanate upwards from the hole.

When we distill all of the evidence presented at trial and view it most favorably to the plaintiff, we are still unable to conclude that the plaintiff has made a *prima facie* showing that the Blitzer assembly was the cause of the fire. Plaintiff's sole expert, Professor Zurheide, responded to a hypothetical question by stating that "the explosion of gasoline fumes could

have, and very likely would have been achieved by sparks created from the fence charger in operation." But, this opinion is based on a series of assumptions, the probability of which was never established.

Not only must a gap of less than one-fourth inch have occurred somewhere in the system, but that gap must have been reached from the other side of the north shed wall, by gasoline fumes which constituted between 1½ and 7½% by volume of the air around the assumed spark. The fire must also have not been caused by other sources, such as the wiring in the shed, or from something inside the hole itself.

■■ A plaintiff may prove his case by using circumstantial evidence, and that evidence need not both create a reasonable inference of the fact to be shown and also exclude all other possible inferences. (*Illinois Bell Telephone Co. v. Purex Corp., Ltd.* (1980), 90 Ill. App. 3d 690, 413 N.E.2d 106.) However, the expert testimony in this case accomplishes neither function. It is no more than speculation upon a number of conditions, the existence of which was largely left to guesswork. We cannot accept Professor Zurheide's testimony as anything greater than what it purported to be—a statement that if conditions were right, the Blitzer or fence could have caused the fire.

Moreover, even if the physical setting envisioned by Professor Zurheide was shown to have more than a remote possibility, his testimony conflicts with the accounts of the accident given by the Campbell boys. According to Professor Zurheide, if a spark had ignited the gasoline fumes, the flames would have come from the direction of the spark and not from the hole. But, not only did none of the boys see a spark that day, they were also unequivocal in stating that the flames arose from the bee hole to engulf Brad. Thus, even disregarding the remoteness of the assumptions inherent in Professor Zurheide's conclusions, it is apparent that the plaintiff has failed to present evidence of a theory consistent with eyewitness accounts of the fire.

■■ Because the plaintiff has introduced no evidence to show that *res ipsa loquitur* applies to this case or that Mrs. Tiemann had a duty to supervise him in his use of gasoline, and because his evidence that the Blitzer and fence caused the fire was both highly speculative and internally inconsistent, we must conclude that the trial court should have directed verdicts in favor of all defendants. For that reason we affirm the judgment of the Circuit Court of Madison County.

Affirmed.

KARNS, P. J., and HARRISON, J., concur.