JACQUELINE MAGNONE, Special Adm'r of the Estate of Jeffrey Magnone, Deceased, Plaintiff-Appellee and Cross-Appellant, *v.* CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Defendant-Appellant and Cross-Appellee.

First District (4th Division)   No. 83—1913

Opinion filed July 12, 1984.—Rehearing denied August 16, 1984.

John S. Bishof, Jr., and James P. Daley, both of Chicago, for appellant.

Parrillo, Weiss & Moss, of Chicago (Paul Parker, of counsel), for appellee.

PRESIDING JUSTICE LINN delivered the opinion of the court:

Plaintiff brought an action for damages against defendant (the Railroad) and several of its employees for the wrongful death of her son. Following a bench trial, the Railroad was found negligent, and plaintiff's decedent was found 25% comparatively negligent. Judgment was entered in the sum of $155,854.14, gross damages reduced by 25%. Judgment was entered against plaintiff in favor of the Railroad's employees.

The Railroad appeals, claiming that the trial court's decision was against the manifest weight of the evidence. Plaintiff cross-appeals from the finding that her decedent was 25% comparatively negligent.

We affirm the decision of the trial court.

FACTS

On October 12, 1978, at approximately 10 p.m., plaintiff's decedent was driving northbound on Wolf Road in Des Plaines, when he approached the railroad crossing of defendant, Chicago and North Western Transportation Company (Railroad). The crossing is guarded by automatic gates positioned to the immediate north and south of the tracks. Each gate is equipped with a bell, two pairs of red lights on each of three posts, and three additional individual red lights on the arm of each gate. Ideally, when activated by an approaching train, the bells sound, the red lights flash, and the arms gradually lower to ex-

tend across the two northbound lanes south of the crossing, and the two southbound lanes north of the crossing, thereby blocking access to the tracks.

Plaintiff's first witness, James Johnston, a 41-year-old flight engineer for United Airlines, was present at the Wolf Road crossing at the time of the accident. Johnston stated that he routinely drives southbound on Wolf Road to get to work each evening.

On the evening of the occurrence, as Johnston approached the crossing, he noticed the red lights at the intersection begin flashing. As he started to slow down his car, he saw a train coming from his left at a speed of approximately 20-30 miles per hour, one-half block to 100 yards away. He noted that the arm of the gate was operating in an unusual manner, moving in a "slow hesitating motion." Johnston stated that as he came to a stop, the arm continued to haltingly lower, bouncing approximately 1½ feet before it came to a final resting position. Moreover, he stated that the train was actually entering the intersection and crossing the roadway before the arm was stationary.

Johnston recalled that while he was stopped facing southbound immediately prior to the occurrence, the speed of the descending crossing arm was abnormally slow. He stated that the reason he had specifically noted the slow speed of the arm was that he had been "playing a mind game in [him]self" thinking that he "could make it too [across the tracks] if [he] wanted to with no intention of doing it." Johnston was thinking this as he observed the headlights of decedent's car coming towards him from the opposite northbound lane, approximately one-half second prior to the collision.

Kendel Okon, a high school acquaintance of decedent's, was present at the Wolf Road crossing as a passenger in her father's van at 7:30 a.m. the morning of the collision. Okon testified that her father stopped the southbound van as it reached the railroad crossing because the arm of the gate started to lower. She noted that the arm, rather than making a smooth descent, went up and down three times before coming all the way down. She also observed that the arms of both the north and south gates were going through the same up and down motion.

Okon testified that after the gates finally came down, her father waited for a train to come, but no train ever came through the crossing. After five minutes of waiting, Okon's father maneuvered around the still-lowered crossing arm and across the intersection.

Kurt Rossberger, a 28-year-old salesman, was an eyewitness to the collision. Rossberger was stopped in the inside southbound lane of

the Wolf Road crossing, waiting for the approaching train to cross the intersection. There were no cars stopped in front of him. He had stopped in response to the red lights flashing and the gates beginning to lower. As he waited at the crossing, Rossberger noticed the headlights of decedent's car bobbing up and down as they faced him from the inside northbound lane. This bobbing motion gave Rossberger the impression that decedent's car was up on the railroad tracks. Rossberger could not recall if the south gate was down at the time of the collision. Rossberger testified that 10 seconds elapsed between the time the gates were finally down and the train entered the intersection.

Henry DePaepe, an employee of defendant Railroad since 1948, was leading maintainer in charge of the Wolf Road crossing in October 1978. He testified that he was called to examine the crossing one hour after the collision and that he conducted the examination alone. DePaepe's examination consisted of "shunting the gates," triggering the gates by placing a wire across the tracks to de-energize the relay rather than observing the operation of the gates in response to the actual approach of a train. He "shunted the gates" at three different distances from the crossing. At the first shunting, he could not observe the gates and determined that the crossing was operating "just by hearing it." At the second shunting, some 500 feet from the crossing, he observed that the north gate, which blocked the southbound traffic, "went down." He still did not observe the south gate, that which would have blocked decedent's access to the tracks. At the third shunting, approximately 100 feet from the crossing, DePaepe observed that "both gates go down approximately the same time." All the lights worked.

DePaepe then operated the gates once more with the manual switch. His observance as to the timing of the gates was that "they both went down at the same time." He further observed that all the lights worked. The next morning, DePaepe was again present at the crossing and chanced to observe the operation of the gates in response to the actual approach of a train. He testified that the gates "operated just about the same." A hypothetical was posed to DePaepe in which the signal protection for the northbound traffic failed and the gate for the southbound traffic was operating. DePaepe's opinion was that such a situation could not happen. He explained that the lights and the arms of the gates operate independently of each other, such that the coinciding of a light and arm malfunction on one gate would be highly unusual. He stated that if the lights on one side were not operational, and the lights on the other side were working

but the arm did not go down, there would be two separate problems.

Three witnesses testified to being present at the accident scene the morning after the occurrence. Joseph Wolsztyniak, then district claim agent for defendant Railroad, photographed the scene. He then drove his car between the tip of the lowered gate and the median supporting post to determine if a car, such as decedent's car, could pass through while the arm was down without damaging the gate or the median. He testified that it could be done.

Frederick Meyers and Joseph DePinto, two former classmates and friends of decedent's, drove to the accident site upon learning of their friend's death, arriving there at approximately 8:30 a.m. the morning following the occurrence. They both testified to witnessing four or five men working simultaneously at a silver-gray control box and the arms of the gates working very erratically. DePinto described the gates as "stuttering down" to a 45-degree angle, then back down and up again. He estimated this happened about 10 times. Meyers passed the scene an hour later that morning and saw that the men were still "working on it" and that the gates were still operating erratically. When he passed the crossing yet another 1½ hours later, the workmen were still there.

The four crew members who were operating defendant Railroad's train at the time of the accident testified at trial. Robert C. St. John, Vernon Lewis, and Paul Johnson, three of the Railroad's employees, were named as parties defendant. Robert C. St. John, conductor, was seated on the right hand side of the lead engine at the time of the occurrence. St. John testified that as he approached the Wolf Road crossing, he was able to observe the gates operating from approximately 200 yards away. He stated that he first observed the north gate was down when he was 200 feet from the crossing. This testimony was contradicted by that of Vernon Lewis, brakeman, who was seated on the left side in the lead engine at the time of the incident.

Testifying for plaintiff, Lewis affirmed his earlier deposition testimony in which he stated that trees and bushes obscured his view of the Wolf Road crossing as the train approached the intersection and that "the only way you would see when you come, right, you have to be right there on the crossing." He also stated, "You have to be almost across the crossing to be able to see around the corner." The corner to which Lewis referred was the curve of the railroad tracks as they approach the Wolf Road crossing.

Paul Gregory Johnson, conductor, examined the crossing immediately after the accident. He found skid marks in the crossing between the northbound and southbound lanes. In his opinion, the marks were

those of a heavy object which had been pushed or moved along the ground.

Jeff Randall, brakeman, was seated in the left side of the caboose at the time of the accident. Randall testified that he was able to observe the signal lights at the crossing operating when the train was approximately 150 feet from the intersection. He had observed that the three red lights on the arms of the gates were operating and in a horizontal position.

Plaintiff's third rebuttal witness to testify over defendant's objection was Thomas Bridges, a detective with the Chicago police department retained by plaintiff to investigate the accident scene. He conducted his investigation on June 1, 1980, some 20 months after the accident. Bridges testified that he found that the tiny holes or "bull's-eyes" located on the side of the flashing light fixtures on the southeast corner of the Wolf Road crossing had been painted black or partially black. These lights were intended to be visible to an approaching train.

The trial court found in favor of the employee defendants as against plaintiff and against defendant Railroad in plaintiff's favor. The court further found that plaintiff's decedent was 25% comparatively negligent and reduced the judgment correspondingly. Defendant now appeals, and plaintiff cross-appeals.

OPINION

■ In a nonjury trial, the trial judge, as the trier of fact, is in a superior position to determine the credibility of the witnesses and to weigh their testimony; where his factual findings are not against the manifest weight of the evidence, they must be accepted on review. (*Agrinetics, Inc. v. Stob* (1980), 90 Ill. App. 3d 107, 412 N.E.2d 714.) On appeal, defendant argues that the trial court's decision was against the manifest weight of the evidence, claiming as error the admission of the testimony of Kendel Okon, Joseph DePinto, Frederick Meyers and Thomas Bridges. Defendant further claims as error the trial court's admission of certain testimony pertaining to damages. After a careful review of the record, we find that the trial court's decision was not manifestly erroneous.

In the instant case, plaintiff alleged negligence. The essential elements of an action sounding in negligence are the existence of a duty of reasonable care owed plaintiff by defendant, breach of that duty, and injury proximately resulting from that breach. (*Johnson v. Burlington Northern, Inc.* (1982), 107 Ill. App. 3d 130, 437 N.E.2d 334.) Preliminary to our determination of whether the trial court's

findings of negligence on the part of both the defendant and the plaintiff's decedent were manifestly erroneous, we must rule on defendant's claims of error to insure that all the evidence considered was competent.

■ Defendant first objects to the trial court's admission of the testimony of Kendel Okon. Okon testified that on the morning of the accident the arms of the crossing gate were operating abnormally in a bouncing, halting manner, as if in response to an approaching train when none was in fact approaching. Defendant, citing *Churchill v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 127, 383 N.E.2d 929, objects on the grounds that testimony concerning the operation of the gate on a prior occasion when no train was present does not tend to prove that the gate failed when a train was present. While *Churchill* does state that faulty operation on a "later date" does not tend to prove that the signals were malfunctioning on the date in question, the case goes on to state that such evidence is admissible to rebut the testimony of an expert witness who has stated that the injury sued upon could not have been caused by the defendant's conduct as alleged. 73 Ill. 2d 127, 143.

Here, DePaepe, defendant's expert, examined the crossing gates by "shunting" them or triggering the automatic mechanism when no train was present. Based thereupon, he testified that the gates were operating simultaneously in response to the shunting, necessarily implying that the shunting mechanism was working properly. Okon testified that the gates were operating improperly by responding to the triggering mechanism when no train was present. Her testimony therefore directly rebutted that of the expert and, as such, was properly admitted.

■ Defendant next objects to the admission of the testimony of Joseph DePinto and Frederick Meyers on the grounds that it was irrelevant and not rebuttal. Defendant further claims that the testimony of these witnesses should not have been allowed because plaintiff did not disclose them in answer to an interrogatory.

In response to defendant's first basis for objection, we note that the trial court found the testimony of these witnesses to be relevant and to be rebuttal. The trial judge based his finding on the fact that DePaepe testified the gates were working properly after the accident, and these witnesses testified that they were not. We see no error in this reasoning. Moreover, despite the conclusion in defendant's brief that "it is obvious from the testimony of Messrs. DePinto and Meyers that plaintiff was aware of these witnesses on October 13, 1978," there is no evidence in record that plaintiff knew these individuals to

have knowledge of the facts "alleged in the complaint" at the time the interrogatory was propounded. Plaintiff did not offer these witnesses as occurrence witnesses nor as witnesses present at the scene immediately after the accident. Under Supreme Court Rule 213(c) (73 Ill. 2d R. 213(c)), plaintiff was under no duty to supplement answers to interrogatories that had been answered in good faith and were complete when made. (*Strope v. Chicago Transit Authority* (1979), 71 Ill. App. 3d 987, 389 N.E.2d 1374.) Absent any evidence that such was not the case here, we find that the trial court's admission of this testimony was proper.

■■ ■ Defendant further objects to the trial court's admitting and giving weight to the testimony of Thomas Bridges, who investigated the crossing on June 1, 1980. Specifically, Bridges testified that a couple of "bull's-eyes," holes on the flashers which reflected light back to the train, were painted over.

When the trial court is the trier of fact, every presumption will be accorded that the trial judge considered only competent evidence and discarded inadmissible evidence in reaching his conclusion. (*Abraham Lincoln Memorial Hospital Corp. v. Gordon* (1969), 111 Ill. App. 2d 179, 249 N.E.2d 311.) Here, this presumption is adequately supported by the record. When defendant objected to the admission of Bridge's testimony, the trial judge repeatedly stated that his reason for admitting the testimony was to put the railroad on notice as to the problem. The trial judge specifically stated that he did not think the railroad "would have anything to do with painting peepholes" and that it could well be a sophisticated act of vandalism. Additionally, defendant admitted in closing argument that "the gates have nothing to do with the bull's eyes ***." In light of these statements, the admission of Bridge's testimony did not constitute harmful error.

Having found that the testimony of Okon, DePinto, and Meyers was properly admitted, we may now look at all the evidence that was before the trial court to determine whether its finding was manifestly erroneous.

We note initially that the facts that the gates were ultimately down at the moment of impact and that the flashers were flashing at some point prior to impact are not dispositive. The dispositive issue here is whether the gates operated abnormally after the lights began flashing and prior to the moment of impact. The testimony adduced at trial showed (1) that the gates for the north and southbound traffic operated simultaneously and in a like manner, (2) that the arms of the gates could malfunction while the flashers worked properly, (3) that on the morning of the occurrence both gates were observed to be op-

erating abnormally, (4) that at the time of the occurrence the gate for southbound traffic was operating in an erratic, halting and abnormally slow manner, and (5) that on the morning after the occurrence the gates were observed to operate in an erratic, abnormal manner. Defendant fails to negate these facts, essentially maintaining only that the arms worked simultaneously and ultimately lowered and that the flashers worked properly.

■■ ■ The decision in this case must necessarily be based upon circumstantial evidence, as no one observed the south gate at the crucial moments prior to the accident. Plaintiff, in proving her case by the use of circumstantial evidence, need not exclude all other possible inferences while creating a reasonable inference of the facts to be shown. (*Campbell v. Northern Signal Co.* (1981), 103 Ill. App. 3d 154, 430 N.E.2d 670.) After examining the evidence, we find that the trial court's determination that defendant was negligent was not clearly against the manifest weight of the evidence. It will therefore not be disturbed on review.

■■ Finally, defendant claims the trial court erred by allowing into evidence testimony of damages that was speculative and without foundation. The evidence to which defendant objects is the testimony of Mr. and Mrs. Magnone regarding their plans to move to Florida and to begin a distributorship business with plaintiff's decedent.

Initially, defendant concedes that there is a presumption of pecuniary loss in a wrongful death action if the next of kin are lineal kinsmen of the decedent. We note further that lineal kinsmen are presumed, by reason of that relationship alone, to suffer substantial pecuniary loss from the wrongful death of a decedent, and actual loss need not be proved. (*Baird v. Chicago, Burlington & Quincy R.R. Co* (1976), 63 Ill. 2d 463, 349 N.E.2d 413.) Thus, parents are presumed to suffer substantial pecuniary loss from the wrongful death of their minor child. (63 Ill. 2d 454, 349 N.E.2d 413.) In *Baird*, the supreme court affirmed the award of $188,000 each for the wrongful deaths of two minors, 17 and 19 years old. The court noted that in cases where the deceased is a minor, pecuniary damages include the parents' reasonable expectation -of benefits from the continuation of the child's life in addition to the presumption of substantial loss. The *Baird* court qualified this acknowledgment with the fact that this latter presumption is not conclusive and that courts invoking it have buttressed it with supporting evidence of the decedent's good health, industrious habits, and potential longevity. 63 Ill. 2d 463, 349 N.E.2d 413.

■■ ■ In the instant case, evidence adduced at trial showed that the decedent was in excellent health, had grown tremendously, both

physically and mentally, during high school, and showed a promising aptitude for sports. He had completed several college preparatory courses in furtherance of his plans to attend college and had worked for his father, full-time during vacations and part-time during the school year, since he was 15 years old. This evidence is sufficient to buttress the presumption that decedent's parents suffered substantial pecuniary loss by virtue of his wrongful death. Where, as here, there is sufficient competent evidence to support the damages awarded, it is presumed that only that evidence was considered by the trial court, and any error in admitting incompetent evidence is harmless. (*General Electric Cablevision Corp. v. City of Peoria* (1972), 8 Ill. App. 3d 948, 291 N.E.2d 295.) For these reasons, the damage award may stand.

■■ ■ Lastly, we consider plaintiff's claim, asserted on cross-appeal, that the trial court's finding that her decedent was 25% comparatively negligent was against the manifest weight of the evidence.

Contributory negligence is lack of due care for one's own safety as measured by a reasonable-man standard; plaintiff is required to exercise that care which the reasonably prudent person would take to avoid injury in like circumstances. (*Long v. City of New Boston* (1982), 91 Ill. 2d 456, 440 N.E.2d 625.) A person may not knowingly expose himself to the danger of injury which might have been avoided by the exercise of ordinary care. (*Stach v. Sears, Roebuck & Co.* (1981), 102 Ill. App. 3d 397, 429 N.E.2d 1242.) Based on the testimony adduced at trial, it was not manifestly erroneous for the trial court to conclude that plaintiff's decedent failed to exercise reasonable care and that he unnecessarily exposed himself to the danger which ultimately caused his death. The court therefore properly reduced plaintiff's gross damages by the percentage of negligence attributable to plaintiff's decedent, 25%, yielding a net damage award of $155,854.14.

For all of the foregoing reasons, we affirm the decision of the trial court.

Affirmed.

JOHNSON and ROMITI, JJ., concur.