DELORES BEDDLA, Plaintiff-Appellant, v. TRACY WILKINS, Defendant-Appellee.

Second District   No. 2—88—0407

Opinion filed April 20, 1989.

834

David A. Decker and Scott B. Gibson, both of David A. Decker & Associates, Ltd., of Waukegan, for appellant.

Deidre B. Derrig, Robert Marc Chemers, and Michael G. Bruton, all of Pretzel & Stouffer, Chartered, of Chicago, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Following an automobile accident, plaintiff, Delores Beddla, filed a one-count complaint alleging negligence against the defendant, Tracy Wilkins. At trial, following the completion of the plaintiff's case, the trial court directed a verdict in favor of the plaintiff on the issue of whether the defendant had exercised reasonable care in operating her vehicle. The jury then returned a verdict in favor of the defendant on the issue of damages. Plaintiff appeals, raising the following issues: (1) whether the jury's verdict is contrary to the manifest weight of the evidence; (2) whether the trial court erred in the giving and/or the refusal to give certain jury instructions; and (3) whether the trial court erred in refusing to allow the testimony of one of plaintiff's witnesses.

The facts surrounding the accident are not in dispute. On May 12, 1986, plaintiff's vehicle was stopped at a red light. The vehicle behind plaintiff was also stopped for the red light. A vehicle driven by defendant struck the vehicle behind plaintiff's vehicle which, in turn,

was pushed into plaintiff's vehicle. Immediately prior to the collision, defendant testified that she had been traveling at the posted speed limit, which was 35 miles per hour, or below it. When she noticed the car in front of her had stopped, she applied her brakes and downshifted. According to the defendant, the impact between her vehicle and the vehicle in front of her was very light. Kathryn D'Andrew, a passenger in the middle vehicle, described the impact between the vehicle she was in and plaintiff's vehicle as very light.

Plaintiff testified that she was wearing a seat belt at the time of the impact. Upon impact, she was thrown into the seat belt, and her right shoulder twisted in the seat belt, brushing against the steering wheel. After a minute or two, she felt that something had happened to her right side. She got out of her vehicle and started to walk over to a policeman on the scene; her shoulder began to throb. She told the police officer that something had happened to her shoulder. She was taken from the scene of the accident by ambulance to Condell Hospital, where she was examined by a doctor in the emergency room, and X rays were taken. The doctor advised her that he did not see any new injury on the X ray of her shoulder, but he prescribed a mild pain medication and advised her to see her own physician. According to plaintiff, as a result of the accident on May 12, 1986, her right hand is numb, and she has an aching pain in her right shoulder and arm. Due to these conditions, she is unable to work and also is severely limited in her ability to perform even basic household tasks.

Much testimony was introduced regarding previous injuries suffered by the plaintiff. Plaintiff, as well as several of her doctors, testified about a series of prior injuries to the plaintiff's neck, back, shoulder, and right arm. Plaintiff testified that she had always had problems with her neck due to a fall down stairs in which she hit the back of her neck. The problem with her neck had never kept her from working. In 1983, she injured her right arm, neck, and shoulder while lifting chairs as part of her job as a school custodian. She did seek medical treatment for these injuries and was told not to lift anymore. She had pain in her neck, shoulder, and arm which she recalled did not last, as she did not take off any time from work for it. Plaintiff admitted that in 1983, she reported to Dr. Baehr, who was treating her, that she had had chronic neck and shoulder pain for years. At that time, she was also treated by a chiropractor.

Plaintiff testified further that on May 25, 1985, she was involved in an automobile accident in which she severely injured her shoulder. Her shoulder was completely dislocated, and she underwent surgery. She spent 18 days in the hospital. She was treated by her family phy-

sician, Dr. Bellucci, and by Dr. Baehr. Although Dr. Bellucci told her she should not return to work, plaintiff believed that he was "kidding" her. As recently as February 1987, plaintiff was having glass removed from her arm that was imbedded there as a result of the May 1985 accident, and some glass still remained in her arm.

According to plaintiff, she last saw Dr. Baehr in August 1985, at which time he released her from his care, telling her she could return to work but not as a school bus driver or a custodian due to the lack of strength in her arm.

Plaintiff admitted that her shoulder was not completely pain free following the 1985 accident. She did not recall seeing Dr. Baehr in January 1986, complaining of shoulder pain. She did see Dr. Peter Chhabria, a neurologist, and agreed to have neurological tests performed on her shoulder and arm four months prior to the May 1986 accident due to her complaints of pain.

Plaintiff did not recall telling Dr. Bellucci in December 1985 that her right arm was constantly numb. She acknowledged, however, that if his records showed such a complaint, she would not disagree with his record. She did recall telling Dr. Bellucci in January 1986 that her right arm ached and was numb. Plaintiff did not recall telling Dr. Bellucci that she had a hard time driving, nor did she recall telling him on February 7, 1986, that the numbness was constant in her right arm. Finally, plaintiff did not recall telling Dr. Bellucci on May 7, 1986, five days prior to the instant accident that she was still suffering pain in her left shoulder.

Plaintiff further acknowledged that Dr. Bellucci had helped her obtain a handicapped parking sticker in January 1986. She stated, however, she only used it for parking when it was very cold. She denied having any problems with driving because of her arm.

Dr. James Baehr, a board-certified orthopedic surgeon, testified on behalf of plaintiff as follows. He is a board-certified orthopedic surgeon. Plaintiff was referred to him in June 1985 by her family doctor, Dr. Bellucci; she had been treated by Dr. Baehr previously. Plaintiff had been in an automobile accident and had dislocated the acromio-clavicular joint (the attachment of the collar bone onto the shoulder blade). The injury was of the most serious grade. Dr. Baehr performed surgery on plaintiff's right shoulder and continued to see her for follow-up visits until she was released from his care in August 1985. At that time, Dr. Baehr was of the opinion that plaintiff was doing well, but he advised her not to return to work as a bus driver or a janitor but to seek a different type of work that would not require heavy use of her shoulder.

According to Dr. Baehr, his records indicated that in January 1986, plaintiff complained of pain in her shoulder, numbness around the shoulder and in her arm and hand. Dr. Baehr also noted diminished reflexes in both arms. Dr. Baehr did not see any reason for the increased pain in her shoulder, and therefore, he referred her to Dr. Peter Chhabria, a neurologist.

Dr. Baehr testified further that on May 13, 1986, plaintiff was seeing his partner, Dr. Thomas Baier, as a result of an automobile accident on May 12, 1986. New X rays did not show any change. Dr. Baier's diagnosis was that plaintiff had suffered a contused right shoulder. Dr. Baehr continued to see plaintiff. Although her pain was better, she had intermittent weakness but that had preceded even her original accident. It was Dr. Baehr's opinion that plaintiff was suffering from post-traumatic degenerative arthritis of the right acromioclavicular joint aggravated by the automobile accident of May 12, 1986. It was further Dr. Baehr's opinion that the aggravation was permanent and that plaintiff could not be gainfully employed due to the weakness and pain in her arm when she tried to use it for anything strenuous.

On cross-examination, Dr. Baehr testified that in January 1986, he suspected that plaintiff had a pinched nerve in her neck and cervical spondylosis, i.e., arthritis in the neck. Dr. Baehr acknowledged that plaintiff had complained of chronic neck and shoulder pain as far back as 1983, which likely meant she had degenerative arthritis as far back as 1983. Dr. Baehr also acknowledged that plaintiff's complaints were very similar when he saw her on January 13, 1986, as they were on May 13, 1986, the day after a second automobile accident. As of August 1986, Dr. Baehr suspected a psychological element to plaintiff's complaints. Apart from plaintiff's subjective complaints of pain and her feeling of numbness and clumsiness, Dr. Baehr did not see any reason why plaintiff could not return to work.

Dr. Peter Chhabria, a board-certified neurologist, testified on behalf of plaintiff. He saw plaintiff initially on May 28, 1985, following the first automobile accident due to her complaints of headache, dizziness, and neck and right arm injuries. He next saw her on January 20, 1986, when she was referred to him by Dr. Bellucci because of her right arm and shoulder symptoms. She denied having any problem with her neck. Dr. Chhabria performed neurological diagnostic tests for nerve damage on plaintiff, which proved normal. He again saw plaintiff on June 23, 1986, due to her complaints of pain following the second automobile accident on May 12, 1986. Based upon a clinical impression, Dr. Chhabria diagnosed plaintiff as suffering from acute cer-

vical sprain, possibly radiculopathy (a condition affecting the nerve roots as they come out of the spine). Dr. Chhabria then performed another somatosensory evoked potential test, the results of which were normal. On June 26, 1986, he did a second EMG (electromyelogram) and a nerve conduction study on plaintiff. He found the results of those tests to be abnormal and consistent with the finding of cervical radiculopathy and with plaintiff's complaints of numbness and pain.

Dr. Chhabria testified that in his opinion, plaintiff's symptoms, complaints, and nerve injuries to her right side were related to the 1986 automobile accident. He believed that plaintiff's condition of cervical radiculopathy had been aggravated by the May 1986 accident. His opinion was based, in part, on the abnormal result from the EMG test conducted after the accident of May 12, 1986.

Dr. Chhabria acknowledged that in January 1986, plaintiff had complained of pain and numbness in her right arm. He had diagnosed plaintiff's condition as cervical radiculopathy in January 1986. Dr. Chhabria also acknowledged that plaintiff had complained to him of numbness in her arm, neck, and shoulder prior to the May 1986 accident.

Dr. James E. Devine, a clinical psychologist, testified on behalf of defendant as follows. He initially saw plaintiff on December 15, 1986, when she was treated at the Lake Forest Pain Clinic following the accident of May 12, 1986. Plaintiff underwent psychological testing at Dr. Devine's direction to determine what course of treatment plaintiff should have. Plaintiff recited to Dr. Devine that she was feeling pretty good but had trouble sleeping. She was also attending physical therapy. He saw plaintiff on February 5, 1987. She had missed four physical therapy appointments and never gone back to physical therapy. She had also ceased taking her prescription, stating it made her feel groggy. He last saw plaintiff on February 12, 1987.

Dr. Devine explained that in some cases, there was a compensation factor which plays a role in a patient's complaint of pain. He described the compensation factor as, "[B]y being involved in litigation, the sicker you are, the longer you are, the more financially you will prosper from the pain and suffering." Dr. Devine was of the opinion that compensation was, in fact, playing a role in plaintiff's complaints of pain.

On cross-examination, Dr. Devine stated that Dr. Davis, the staff neurologist at the pain clinic, could not find any objective basis for plaintiff's complaints of pain, which he acknowledged was contrary to the finding of Dr. Chhabria. He believed plaintiff's complaints of pain and never felt she was lying to him, nor did he diagnose her to be a

classic malingerer. Dr. Devine further acknowledged that because they had been unable to determine the reason for the pain, did not mean the pain does not exist.

On redirect examination, Dr. Devine reiterated his statement that while plaintiff was not a classic malingerer, there were signs that compensation was playing a role in the pain and her responsiveness to treatment.

On re–cross-examination, Dr. Devine stated that he had reason to doubt that the pain was real to plaintiff.

Dr. Lloyd S. Davis, a board-certified neurologist, testified by way of evidence deposition as follows. He is affiliated with the Lake Forest Pain Clinic and examined plaintiff there on December 15, 1986. His impression after examining plaintiff was that she had a chronic pain syndrome involving the right arm and neck. He found that the objective neurological findings were essentially unremarkable, and he also felt that there was a large emotional overlay in her sensory examination.

Dr. Davis testified that he reviewed the same tests reviewed by Dr. Chhabria, and he did not believe that the second EMG performed after the May 1986 accident was abnormal. Based upon his interpretation of the tests and his examination of plaintiff, he thought the likelihood that plaintiff suffered from cervical radiculopathy was quite low, although he could not rule it out completely. Dr. David explained why he interpreted the EMG as normal and why the results did not lead to the diagnosis of cervical radiculopathy. From a neurological basis, he could not explain plaintiff's complaints of pain. Finally, Dr. David testified that he suspected that psychological factors were playing a role in the production of plaintiff's pain.

Dr. John Bellucci, plaintiff's family physician, testified on behalf of the defendant as follows. He had treated the plaintiff since 1971. According to his records, he saw plaintiff on May 5, 1986, one week prior to the second automobile accident, at which time she complained of shoulder pain. On February 7, 1986, plaintiff had complained of constant numbness in her right arm. On January 7, 1986, plaintiff complained of numbness in her right arm and that her arm ached. Similarly, on December 9, 1985, the plaintiff complained that her right arm was constantly numb, that she had limitation of motion in her right arm and severe pain in the right shoulder. On November 25, 1985, plaintiff's chief complaint to him was numbness in her right arm.

On cross-examination, Dr. Bellucci testified that he also treated plaintiff on other occasions during this time period for allergy prob-

lems. On those occasions, he did not note that she complained of pain in her shoulder.

On redirect examination, Dr. Bellucci stated that even though he did not note the complaints, each time plaintiff visited him, she complained of pain.

The jury returned a verdict in favor of the defendant. Following the denial of plaintiff's post-trial motion, she filed the instant appeal.

■ Before we address the merits of this appeal, we call to the attention of counsel for the plaintiff that plaintiff's brief is in violation of Supreme Court Rule 341(e)(4)(ii) (122 Ill. 2d R. 341(e)(4)(ii)) in that the brief does not contain the jurisdictional statement required by that supreme court rule in all appellants' briefs filed August 1, 1988, and thereafter. Given the fact that plaintiff's brief in this case was filed August 3, 1988, and that the requirement of a jurisdictional statement is a relatively new one and that our jurisdiction of this case is clear and not disputed, we do not elect to dismiss the appeal. However, we caution all appellate counsel that future such violations will be dealt with appropriately.

We now turn to the merits of plaintiff's appeal.

■ ■ Plaintiff's complaint alleged that as a result of defendant's negligence, she was injured. The essential elements of an action sounding in negligence are the existence of a duty of reasonable care owed to plaintiff by the defendant, breach of that duty, and injury proximately resulting from that breach. (*Magnone v. Chicago & North Western Transportation Co.* (1984), 126 Ill. App. 3d 170, 176.) In the case before us, the trial court at the close of the plaintiff's case directed a verdict in favor of the plaintiff on the issue of the duty owed to plaintiff by the defendant. The jury, however, still had to determine whether the breach of that duty was the proximate cause of plaintiff's injuries. Before we can determine whether the determination of the jury on that point was against the manifest weight of the evidence, as claimed by plaintiff, we must review plaintiff's claims of error to insure that all the evidence considered was competent. 126 Ill. App. 3d at 177.

Plaintiff contends that the trial court erred in failing to give the following jury instructions which were tendered by plaintiff:

"The court has ruled as a matter of law that the defendant is liable for any injury which may have proximately resulted from the occurrence. You need only decide what injuries to the plaintiff resulted from this occurrence and what amount of money will reasonably and fairly compensate the plaintiff for those injuries." (See Illinois Pattern Jury Instructions, Civil, No. 23.01

(2d ed. 1971) (hereinafter IPI Civil 2d).) (We note that the first sentence of this instruction was given.)

"The plaintiff has the burden of proving each of the following propositions:

First, that the plaintiff was injured;

Second, that the negligence of the defendant was a proximate cause of the injury to the plaintiff." See IPI Civil 2d No. A21.02 (Supp. 1986).

"One form of verdict is supplied with these instructions. After you have reached your verdict, fill in and sign the form of verdict and return it to Court. The verdict should be signed by each of you. You should not write or mark upon this or any of the instructions given to you by the Court." (See IPI Civil 2d No. 45.01.)

Plaintiff also objects to the failure to give her instruction No. 14, which was the verdict form assessing the amount of plaintiff's damages (See IPI Civil 2d No. A45.09 (Supp. 1986)). Plaintiff also objected to the giving of defendant's instruction No. 4, which provided as follows:

"The plaintiff has the burden of proving each of the following propositions:

First, that the plaintiff was injured;

Second, that the negligence of the defendant was a proximate cause of the injury to plaintiff.

If you find from your consideration of all the evidence that each of these propositions has been proved, then your verdict should be for plaintiff. On the other hand, if you find from your consideration of all the evidence that any of these propositions has not been proved, then your verdict should be for the defendant." See IPI Civil 2d No. A21.02 (Supp. 1986).

Interestingly enough, in his argument for a directed verdict on the issue of liability, plaintiff's counsel stated:

"Now I know that the defendant is going to be contesting the amount of injuries from the collision but that has nothing to do with the actual liability. I think the Court can direct the verdict in my client's favor and theoretically the jury could still come back with zero damages based on her arguments or upon the evidence after they have reviewed it."

Plaintiff now argues on appeal that the only issue for the jury to decide was the amount of damages to be awarded plaintiff, not whether any damages should be awarded, relying, *inter alia,* on *Exchange Na-*

*tional Bank v. Air Illinois, Inc.* (1988), 167 Ill. App. 3d 1081, and *Fisher v. Patel* (1981), 93 Ill. App. 3d 694.

In *Fisher,* the jury was instructed that if it found from the evidence that plaintiff was not injured and/or that the conduct of defendant was the proximate cause of plaintiff's injury, the verdict should be for the defendant by reflecting "zero" damages to the plaintiff. (93 Ill. App. 3d at 698.) The jury found the defendant liable but awarded no damages. While the reviewing court acknowledged that under certain circumstances the giving of a zero verdict instruction to the jury has been upheld, it stated:

"[W]here plaintiff's evidence is not inconsistent, or contradictory, and proof of actual damages is corroborated by witnesses' testimony, the giving of a zero verdict instruction results in error that is substantially prejudicial and affects the outcome of the trial necessitating reversal." 93 Ill. App. 3d at 697.

In *Exchange National Bank v. Air Illinois, Inc.,* the plaintiff's decedent was killed in the crash of one of defendant's aircraft. The defendant appealed the jury's verdict awarding damages. One of the errors alleged by defendant was the refusal of the trial court to give that portion of IPI Civil 2d No. A21.02 (Supp. 1986) which instructed the jury to find for the defendant if any of the burden of proof propositions had not been proved. The jury was instructed that the plaintiff had the burden of proving the amount of pecuniary damage suffered by the decedent's husband. The reviewing court held that since liability was not an issue and only damages were to be assessed, the instruction was not error as no defense verdict could have properly been rendered under the evidence presented at trial.

Both *Fisher* and *Exchange National Bank* are distinguishable from the case before us. Unlike in *Fisher,* the defendant here introduced medical evidence which tended to establish that plaintiff's condition was the result of the 1985 automobile accident, as well as other prior physical problems. Further, in *Exchange National Bank* where it was undisputed that the decedent's injuries which culminated in her death resulted from the airline crash, in the case before us, there was evidence that plaintiff's injuries were the result of prior accidents. Finally, as the defendant points out, the jury in this case was not instructed that it could return a verdict for zero damages; rather, it was instructed that the plaintiff had the burden of proving that the defendant's negligence proximately caused her alleged injuries and that if the plaintiff failed to meet that burden, the jury could find in the defendant's favor.

In *Rapp v. Hiemenz* (1969), 107 Ill. App. 2d 382, the trial court,

at the close of all the evidence, directed a verdict for the plaintiff on the issue of liability. The plaintiff there objected to instructing the jury on the issue of proximate cause and to submitting a verdict form which permitted the jury to find for the defendant and against the plaintiff. In finding no error in either the giving of the complained-of instruction or verdict form, this court stated as follows:

"The instructions complained of referred to the issue of proximate cause of the injuries. The trial court had clearly indicated, that in directing the issue on liability, it was doing so only on the issues of negligence and contributory negligence. Both the issues of proximate causation and damages were to remain for the determination of the jury. The approach may have been somewhat unique, but there was no misunderstanding by counsel or litigants with reference to what the court was doing. It was proper, and essential, under this approach, to instruct the jury relative to proximate cause as an issue in the case.

Because the issue of proximate cause of the injuries remained in the case, it was also proper to submit a verdict form which would have permitted the jury to have found for the defendant and against the plaintiff. Further, the fact that the jury did find for the plaintiff indicates that the plaintiff suffered no prejudice from the submission of this verdict form." 107 Ill. App. 2d at 388.

■ Although the verdict was for defendant in this case, we are of the opinion that in view of the remark of plaintiff's counsel, quoted above, there was no misunderstanding with regard to the effect of the directed verdict on the issue of negligence and that it was clear to all parties that a judgment for defendant was one of the possible verdicts the jury could return. We conclude, therefore, that the jury was properly instructed.

■ Next, the plaintiff contends that the trial court erred in refusing to allow the evidence deposition of Thomas Rudd, plaintiff's former supervisor, to be read to the jury either as part of the plaintiff's case in chief or as rebuttal evidence. Rudd was plaintiff's supervisor from 1972 to 1985 up to and including the time after her first accident. Plaintiff maintains that one of the major issues in the case was her motivation to be able to work before and after the injuries she suffered in the May 1986 automobile accident. Plaintiff argues that she was prejudiced in not being allowed to present Rudd's testimony, which would have confirmed that she was not a malingerer and was in fact motivated to work when she was physically able to do so,

to contradict defendant's allegations that plaintiff was not motivated to try to return to work after the May 1986 accident due to the lawsuit and the potential of financial gain.

We observe that plaintiff has failed to cite any authority in support of her position on this issue in violation of Supreme Court Rule 341(e)(7) (113 Ill. 2d R. 341(e)(7)). Therefore, the argument on this issue is waived. *Rockford Memorial Hospital v. Schueler* (1988), 167 Ill. App. 3d 358, 362.

Finally, plaintiff contends that the jury's verdict is against the manifest weight of the evidence.

■■ When considering whether a verdict is contrary to the manifest weight of the evidence, the reviewing court must view the evidence in the light most favorable to the appellee. (*Bautista v. Verson Allsteel Press Co.* (1987), 152 Ill. App. 3d 524, 529.) Resolution of contradictory testimony is not a function of the reviewing court, and even if there is conflicting evidence which is substantially equal on pertinent factual questions, the reviewing court cannot reevaluate the evidence and set aside a jury verdict merely because it could have reached a different conclusion. (*Bass v. Washington-Kinney Co.* (1983), 119 Ill. App. 3d 713, 728.) It is the jury's function to evaluate the weight of the evidence and to assess the credibility of the witnesses, and its findings will not be disturbed unless the verdict was palpably erroneous, the opposite verdict clearly compelled, or the findings appear to be unreasonable, arbitrary, and not based upon the evidence. 119 Ill. App. 3d at 728.

We have previously set forth in some detail the evidence in this case and, therefore, will not repeat the evidence here. We have carefully reviewed the entire record in this case, and on the basis of the test of review established above, we find that the verdict of the jury in this case is not against the manifest weight of the evidence.

The judgment of the circuit court is affirmed.

Affirmed.

UNVERZAGT, P.J., and NASH, J., concur.