ROBERT H. HARRISON, Plaintiff-Appellant, v. CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Defendant-Appellee.

First District (3rd Division)    No. 1—92—1092

Opinion filed June 15, 1994.

858

William J. Harte, Ltd., and Herbert F. Stride, Ltd., both of Chicago (William J. Harte and Herbert F. Stride, of counsel), for appellant.

James P. Daley, George H. Brant, and Daniel J. Mohan, all of Chicago, for appellee.

JUSTICE GREIMAN delivered the opinion of the court:

Plaintiff Robert Harrison brought suit under the Federal Employees' Liability Act (45 U.S.C. § 51 *et seq.* (1988)) (FELA) for injuries sustained while an employee of defendant Chicago and North Western Transportation Company. The jury returned a verdict for defendant, and plaintiff appeals on grounds that: (1) the verdict was against the manifest weight of the evidence; (2) the trial court erred by allowing the testimony of a defense witness whose statement had not been revealed to plaintiff until shortly before trial, not requiring defendant to produce the witness' personnel file, and interrupting his cross-examination of the witness with disparaging remarks; and (3) the trial court further erred by permitting defendant's former medical director to give opinion testimony although not disclosed as an expert witness.

We affirm the trial court.

Plaintiff applied for work with defendant in 1979 when he was 25 years old. As part of the application process, plaintiff had to successfully complete a physical examination, including an inspection of his legs and knees conducted by Dr. Thomas Cook, director of defendant's medical and rehabilitation programs. Plaintiff testified at trial that, when he began working for defendant, he had no knowledge of any disability regarding his knees which functioned properly during his previous employment where he performed heavy manual labor.

The record shows, however, that plaintiff had a serious degenerative knee condition which probably began during his teenage years. Specifically, plaintiff experienced a condition commonly known as severe tilting of the kneecap, which resulted in a chronic partial dislocation of the kneecap. Since plaintiff's condition existed for years before his employment with defendant, the wearing away of the cartilage in his knees progressed to the point where the top and bottom surfaces of the knee joint, as well as the backside of the kneecap, were devoid of any cartilage and rubbed bone against bone. Two of plaintiff's treating physicians as well as defendant's consulting physician testified that plaintiff's knee condition was the type that one would notice and could be expected to cause pain and disability.

When plaintiff began working for defendant, he learned safety rules related to his job as a "trackman" responsible for repairing worn railroad ties. After a few months, plaintiff became an assistant foreman and then a foreman responsible for his and his crew's safe performance of duties.

Defendant commonly employed track laborers to assist in repairing railroad tracks in various areas. It was common practice for defendant and in the industry for laborers to replace worn out railroad ties manually. Groups of laborers engaged in the replacement of ties were called "tie gangs" if they used heavy machinery and "section crews" if they repaired the track by hand. Whereas tie gangs could be expected to repair several hundred ties a day, section crews could repair only 8 to 10 ties per laborer each day.

During the initial years of plaintiff's employment, a section crew generally consisted of a foreman, an assistant foreman and three or four trackmen. As time progressed, the number of manual section crews decreased due to cost-reduction efforts and track abandonments such that the amount of work or geographical area covered per crew continued to expand. However, the per-day work quota for track laborers remained the same.

In 1985 plaintiff started a business as a chimney sweep while he worked as the foreman of a manual section crew with another trackman, Thomas Kneebone.

On November 5, 1985, plaintiff and Kneebone were assigned to Harvard, Illinois, to work on a side track known as the Sharon side track. Plaintiff testified that a mechanized tie gang worked in the nearby area, although Kneebone disputed this assertion. Plaintiff also testified that, upon arriving at the train station in Harvard, he telephoned his superior, roadmaster Michael Ellis, for instructions. According to plaintiff, Ellis reported that defendant needed the Sharon track repaired for immediate service. Ellis no longer was employed by defendant at the time of trial and was unavailable to testify.

Plaintiff further testified that upon arriving with Kneebone at the Sharon track, he determined critical deficiencies such as poor tie and ballast conditions and plate disbursal of the rail below track joints. He also determined approximately 200 to 250 ties needed replacement. Plaintiff stated that he did not think he and Kneebone could replace all those ties in one day but planned to replace as many as possible to open the track that day. Plaintiff opined that defendant failed to provide them with a safe place to work that day considering the amount of labor they were expected to complete.

Kneebone testified that he discussed that day's work plans with plaintiff and plaintiff never informed him that the track had to be in service that day or that returning the track to service was an emergency. According to Kneebone, plaintiff did not appear to be in a hurry as he worked. Kneebone stated that plaintiff never told him that they were required to replace approximately 200 ties that day,

and characterized the proposition that two men would attempt such a feat as "laughable." He and plaintiff were simply going out to "fix a few bad spots" on the track, and he planned on replacing no more than 20 ties that day, the average quota for two men.

To replace the ties, plaintiff decided that Kneebone would dig the holes in which the ties would rest and he would drag the railroad ties, which weighed over 250 pounds, to the holes before placing them under the track. Plaintiff never asked Kneebone to assist him drag any tie although two men dragging a tie would disburse the weight more evenly. While plaintiff dragged the tie, he secured his footing, bent his knees and avoided twisting or jerking positions in accordance with defendant's safety manual. Plaintiff also used tie tongs as he was trained to do for moving ties.

Although plaintiff followed the instructions he had received as part of his training and as contained in the railroad's work rules, while moving a tie he felt a burning sensation in his left knee. Because of the pain, he and Kneebone stopped working on the Sharon track and returned to Harvard, where plaintiff consulted with a company doctor, who wrapped his knee in bandages and gave him some aspirin.

When the pain persisted, plaintiff sought relief from an emergency room physician who placed his leg in an "immobilizer" and, thereafter, consulted Dr. James Berg, who later testified that the bursting of cartilage around plaintiff's kneecap resulted from a preexisting condition brought to a head by the force generated by the weight of his body plus the weight of the railroad tie he was attempting to drag. Dr. Berg performed knee surgery upon plaintiff in November 1985 and, since plaintiff's leg was not healing properly, again in July 1986. Following the second surgery, Dr. Berg concluded that plaintiff's lifting of the railroad tie caused permanent changes to his kneecap resulting in a permanent disability.

At the present time, plaintiff's left knee continues to cause him pain and buckles when he overextends himself, which occurs a few times a week.

In June 1986 Dr. Cook mailed plaintiff information regarding defendant's rehabilitation program, which sought to return employees to productive employment appropriate to their individual capacities. Dr. Cook testified that, since plaintiff's injury, he had received and reviewed various reports sent by Dr. Berg concerning plaintiff's condition. Dr. Cook also testified that he had experience and training in reviewing records used to determine an employee's candidacy for the rehabilitation program.

After his initial determination that plaintiff would benefit from

rehabilitative services until November 8, 1988, Dr. Cook and his staff mailed plaintiff numerous documents requesting that he undergo testing for job placement. Several notices were mailed to and acknowledged by plaintiff for an appointment in this regard, although no appointment was kept. In November 1986 a staff member wrote plaintiff to invite him to apply for a sedentary position as a train crew caller, and 10 months later Dr. Cook mailed him a letter to remind him of the availability of this position. Upon learning that plaintiff was not interested in participating in the program, Dr. Cook closed his file.

Plaintiff testified that he has worked part-time for a fire department and has trained for a firefighter position since 1984. The fire department hired plaintiff in 1989 as an engineer on a fire truck and in 1990 as an emergency medical technician after he received a rating of "qualified for any job" based upon a physical examination. At the time of trial, plaintiff worked full-time in these capacities.

Testifying on behalf of defendant was David Wehener, who began working with plaintiff in 1979 when Wehener supervised a tie gang to which plaintiff was assigned. Wehener stated that he promoted plaintiff to a supervisory position within a few weeks of their acquaintance for reasons including plaintiff's complaints about his knees. Wehener also stated that plaintiff admitted that his knees were "screwed up" since he worked as a bouncer in a bar a few years before working for defendant. Wehener further stated that, in 1983, plaintiff told him that his knees had been bothering him for awhile and that he wanted to claim his condition as a work-related injury. After the accident, plaintiff allegedly told Wehener that he had started a chimney sweep company so that when he did make the claim against defendant he would have more income to show as a loss. Wehener opined that the injury "was pretty much staged" even though he did not witness the occurrence.

Wehener also testified that he began dating plaintiff's stepdaughter, Tracy Kidd, in 1984 and they became engaged in 1988 before ending the relationship on adverse terms the next year, subsequent to which Kidd filed battery charges against him in Illinois and Wisconsin although a jury found him not guilty in each instance. Wehener's battery arrests occurred several months before he provided a statement to defendant concerning plaintiff's injury.

In late September 1989 plaintiff accompanied Kidd to court for a hearing on the criminal charges against Wehener. As they walked passed Wehener, Kidd heard him say to plaintiff, "I will get you for this you SOB." Wehener denied making this remark.

Wehener left the railroad in December 1989 under accusations

that he improperly accounted for his overtime and expenses (*i.e.*, by appropriating gasoline for personal use). Kidd testified on rebuttal that she had observed Wehener take gasoline and other items from defendant.

Plaintiff first argues that the jury's verdict of no negligence under the FELA was contrary to the manifest weight of the evidence. Plaintiff maintains he demonstrated that defendant directed him to carry heavy ties from where they were stored to the place of their installation when defendant knew or should have known that the ties could not be safely carried by him, and defendant failed to furnish him with sufficient manual or mechanical assistance to carry and install the heavy ties.

The purpose of the FELA is to provide a remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer, and the coverage of the statute is defined in broad language which has been construed even more broadly. (*Pry v. Alton & Southern Ry. Co.* (1992), 233 Ill. App. 3d 197, 207, 598 N.E.2d 448, citing *Atchison, Topeka & Santa Fe Ry. Co. v. Buell* (1987), 480 U.S. 557, 94 L. Ed. 2d 563, 107 S. Ct. 1410.) In a claim under the FELA, the plaintiff must show that his or her injury resulted in whole or in part from the negligence of the defendant by reason of "any defect or insufficiency due to its negligence in its cars, engines, appliances, or other equipment." (*Pry*, 233 Ill. App. 3d at 218, citing 45 U.S.C. § 51 (1982); see *Gonet v. Chicago & North Western Transportation Co.* (1990), 195 Ill. App. 3d 766, 768, 552 N.E.2d 1224.) The plaintiff need only prove slight negligence of the defendant to prevail on his or her claim. (*Pry*, 233 Ill. App. 3d at 218.) On review of a jury trial under the FELA, the reviewing court is limited to the single inquiry of whether the conclusion may be drawn that the negligence of the employer played any part whatsoever in the plaintiff's injury. *Pry*, 233 Ill. App. 3d at 218, citing *Laird v. Illinois Central Gulf R.R. Co.* (1991), 208 Ill. App. 3d 51, 566 N.E.2d 944.

■ There is no evidence corroborating plaintiff's claim that he was assigned an impossible task on the day in question, especially in light of Thomas Kneebone's testimony regarding plaintiff's activity on that day. *Cf. Pry*, 233 Ill. App. 3d at 218 (railroad employee satisfied burden of showing his knee injury resulted from defendant's negligence based upon evidence that he followed defendant's training procedures when, at the direction of his supervisor to use any means available to accomplish the task, he attempted to couple two railcars and was injured in the process).

Moreover, the record does not show that plaintiff's injury resulted from any defect or insufficiency due to defendant's negligence "in its

cars, engines, appliances, or other equipment." (See *Pry*, 233 Ill. App. 3d at 218.) Instead, plaintiff's injury at issue apparently resulted from his failure to follow defendant's safety rules which he learned at the beginning of his employment, which provide in part:

> "Lifting beyond normal capabilities is prohibited. Employees must avoid jerking or twisted position and *obtain help* or mechanical assist device *to lift or handle heavy or cumbersome objects."* (Emphasis added.)

Although plaintiff testified that he avoided twisting or jerking while attempting to drag the tie, he neither pleaded nor proved that he asked, much less obtained, assistance from Kneebone in this endeavor. As the foreman of the section crew, plaintiff's asking Kneebone's assistance would have, in effect, required Kneebone's compliance to disburse the weight of the tie which plaintiff knew exceeded 250 pounds.

Further, it is undisputed that plaintiff's knee condition existed several years before the occurrence at issue. Plaintiff's own treating physicians, Drs. Berg and Fossier, testified that plaintiff suffered from a congenital knee condition whereby the cartilage in his knees became so seriously deteriorated before November 1985 that the left knee joint rubbed "bone against bone."

Under the FELA, a railroad is not subject to absolute liability to its employees; liability under the statute must arise from the employer's negligence based upon substantial evidence in the record. *Gonet*, 195 Ill. App. 3d at 774-75 (railroad properly held not liable for employee's hearing loss given the evidence of his prior exposure to noise and the type of loss treated), citing *Kloetzer v. Louisville & Nashville R.R. Co.* (1950), 341 Ill. App. 478, 485, 95 N.E.2d 502.

For these reasons, plaintiff cannot substantiate his claim that David Wehener's testimony represented "[t]he only significant evidence controverting defendant's liability." It is the province of the trier of fact to determine the credibility of witnesses, weigh contradictory evidence and draw ultimate conclusions from the facts. (*Gonet*, 195 Ill. App. 3d at 776, citing *Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 512, 492 N.E.2d 1364.) Although Wehener testified that plaintiff revealed his intention to claim a preexisting knee condition as a railroad injury, plaintiff produced ample evidence to discount Wehener's testimony as vengeful in light of the battery charges brought against him by Tracy Kidd.

Plaintiff next contends that the trial court committed prejudicial error by allowing Wehener to testify, refusing to require defendant to produce Wehener's personnel file, and making inappropriate remarks during his cross-examination of Wehener.

■ Plaintiff initially challenges the court's decision to allow Wehener to testify as a "surprise witness" after defendant failed to disclose Wehener's identity. However, defendant had no duty to supplement its interrogatory answers to mention Wehener as a person having knowledge of plaintiff's injury since its answers were given in good faith and were complete when made. (*Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, 114, 463 N.E.2d 792, citing *Rogers v. Chicago & North Western Transportation Co.* (1978), 59 Ill. App. 3d 911, 375 N.E.2d 952; see *Magnone v. Chicago & North Western Transportation Co.* (1984), 126 Ill. App. 3d 170, 177-78, 466 N.E.2d 1261.) Illinois Supreme Court Rule 213 provides:

> "If a party makes an answer that is complete when made, he has no duty to supplement the answer to include information thereafter received, unless requested to do so by a timely supplemental interrogatory. However, upon request made at any time before the trial, a party must furnish the identity and location of persons, in addition to those previously disclosed, having knowledge of relevant facts." (134 Ill. 2d R. 213(e).)

The record shows that plaintiff filed his first and only set of interrogatories in April 1986. Defendant filed a partial response in July 1986 and then supplemented its answers two months later upon receiving additional information relevant to plaintiff's injury and treatment. At that time, defendant had no knowledge that Wehener would provide information damaging to plaintiff's case since Wehener was not an occurrence witness and had not yet come forward.

More than three years later, Wehener contacted defendant and provided a court-reported statement on October 24 of that year regarding his knowledge of plaintiff's alleged plan to make a false claim against defendant for his preexisting knee condition. Defendant produced a copy of Wehener's statement for plaintiff to review only after being served with plaintiff's Rule 237 request (134 Ill. 2d R. 237) on the morning of the first day of trial, July 30, 1991.

The next day, plaintiff objected to defendant's use of Wehener's statement partly on grounds that he lived out of State and would not be testifying. Defendant replied, "I don't know where counsel gets that Mr. Wagner [*sic*] may not be available for this trial, because he may well testify in this case." The court decided, if defendant presented Wehener to testify, to conduct a *voir dire* of the witness before allowing any direct or cross-examination.

On August 2, 1991, the court inquired and properly allowed Wehener to testify. See *Magnone*, 126 Ill. App. 3d 170, 466 N.E.2d 1261 (trial court properly allowed witnesses to testify after determining plaintiff had no duty to supplement interrogatory answers which

failed to disclose their identity since plaintiff was not aware of the witnesses at that time); *Thorsen v. City of Chicago* (1979), 74 Ill. App. 3d 98, 105-06, 392 N.E.2d 716; compare *Henderson v. Illinois Central Gulf R.R. Co.* (1983), 114 Ill. App. 3d 754, 449 N.E.2d 942 (trial court improperly prohibited defendant's expert from testifying although not revealed as a witness until after plaintiff filed a request for supplemental interrogatories), with *Anderson v. Chesapeake & Ohio Ry. Co.* (1986), 147 Ill. App. 3d 960, 498 N.E.2d 586 (court properly excluded witness' testimony based upon defendant's discovery violations).

Further, plaintiff has neither pleaded nor proved that defendant possessed any information in its corporate files or otherwise regarding Wehener's knowledge of the alleged fraud plaintiff intended to commit upon the railroad. (*Cf. Chicago Park District v. Chicago & North Western Transportation Co.* (1992), 240 Ill. App. 3d 839, 865-66, 607 N.E.2d 1300 (plaintiff held responsible for its own business records containing falsified information produced in accordance with a discovery request).) Although Wehener maintains that plaintiff told him about claiming his knee as a railroad injury in 1979, Wehener only revealed such information to defendant in 1989, long after defendant responded to plaintiff's interrogatories. Hence, the trial court did not abuse its discretion in determining defendant properly answered plaintiff's interrogatories to allow Wehener to testify. Compare *Bradfield v. Illinois Central Gulf R.R. Co.* (1985), 137 Ill. App. 3d 19, 484 N.E.2d 365, with *Campen v. Executive House Hotel, Inc.* (1982), 105 Ill. App. 3d 576, 434 N.E.2d 511.

■ Plaintiff also avers that the trial court's refusal to disclose Wehener's personnel file denied him a meaningful opportunity to cross-examine him regarding an alleged conspiracy with defendant, *i.e.,* Wehener provided his damaging statement two months prior to his resignation in exchange for defendant's agreement not to discharge him for theft, thereby terminating his employment benefits. Defendant delivered Wehener's statement to plaintiff four days prior to plaintiff's oral Rule 237 request for the file, which occurred immediately prior to Wehener's swearing in for testimony on August 1, 1991. The court refused plaintiff's request to avoid delaying the proceedings to await production of documents from Wehener's personnel file. In light of plaintiff's failure to produce corroborating evidence of his conspiracy theory or make a timely request for the material upon learning of the possibility that Wehener might be called to testify, the trial court's denial of the document production request was reasonable.

Plaintiff further argues that he suffered prejudice from the trial

court's improper remarks during cross-examination of Wehener in which he tried to establish his conspiracy theory. Essentially, the court admonished plaintiff's counsel to avoid making speeches or editorializing in stating, "This is not any Matlock T.V. program, it's a real life trial." The record shows, however, that the court directed its comments at both counsel, who engaged in gratuitous quips beyond the realm of question or objection.

■Moreover, the court's remarks responded to plaintiff's counsel's use of courtroom dramatics in probing why Wehener failed to inform defendant of the alleged fraud with such question-accusations as:

"Well, was there any other thing that you covered up? You covered up for [plaintiff]. You knew he was a damn crook and you covered up and you never told anybody. What else was there at the railroad that went on that you never blew the whistle about?"

Illinois law affords trial judges wide latitude in managing a trial (*Oldenburg v. Hagemann* (1991), 207 Ill. App. 3d 315, 324, 565 N.E.2d 1021), including controlling the conduct of counsel. (*People v. Long* (1968), 39 Ill. 2d 40, 233 N.E.2d 389; see *Belfield v. Coop* (1956), 8 Ill. 2d 293, 313, 134 N.E.2d 249.) In light of the circumstances surrounding the court's statements at issue, we cannot say that the court committed prejudicial error deserving reversal. See *Elizer v. Louisville & Nashville R.R. Co.* (1970), 128 Ill. App. 2d 249, 254, 261 N.E.2d 827 (trial court rather than reviewing court best observes the demeanor of counsel and general atmosphere of the trial).

Finally, plaintiff challenges the trial court's decision to allow defendant to introduce at trial Dr. Cook's deposition testimony, which included his opinion that defendant's rehabilitation program would have benefitted plaintiff and that plaintiff did not significantly participate in the program.

Illinois law provides for the introduction at trial of opinion testimony of a party's former employee if he or she was: (1) employed by the party when plaintiff's cause of action arose; (2) intimately involved in the matter being litigated; (3) not retained as an expert for the purpose of litigation; (4) known to the parties before trial; and (5) equally available to all parties for purposes of discovering his or her testimony. *First National Bank v. Village of Mount Prospect* (1990), 197 Ill. App. 3d 855, 864, 557 N.E.2d 1257, citing *Voyles v. Sanford* (1989), 183 Ill. App. 3d 833, 836-37, 539 N.E.2d 801 (trial court abused its discretion by refusing to allow former employee's opinion testimony); see *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 529 N.E.2d 525.

Applying the *First National Bank* standard to the present controversy, we find that the trial court properly allowed defendant

to offer Dr. Cook's opinion testimony at trial although defendant had not disclosed him as an expert witness pursuant to Illinois Supreme Court Rule 220 (134 Ill. 2d R. 220(b)(1)). Since Dr. Cook directed defendant's medical and rehabilitation programs years before and after plaintiff's accident, he was also "intimately involved" in assisting plaintiff's candidacy for employment and for vocational and rehabilitative instruction to promote his return to gainful employment. Clearly, defendant retained Dr. Cook to testify on plaintiff's failure to become involved with the rehabilitation program, not for the purpose of giving an expert opinion in plaintiff's or any other litigation. *Tzystuck*, 124 Ill. 2d at 234.

■ Moreover, it is indisputable that both parties knew Dr. Cook for years before trial. Plaintiff's testimony contained extensive detail about his preemployment physical examination, administered years before the accident, and offered to suggest he harbored no knee injury prior to the occurrence at issue. Dr. Cook also engaged in extended correspondence with plaintiff regarding the rehabilitation program, and the resulting file was available to plaintiff through normal discovery channels.

Although Dr. Cook was no longer employed by defendant at the time of trial, he was equally available to all parties for discovery purposes. Dr. Cook maintained a residence in the Chicago area and could easily have been deposed by plaintiff upon request.

Plaintiff challenges a finding that Dr. Cook was "intimately involved" with the occurrence at issue on grounds that he was not an occurrence witness, as in *Voyles* (183 Ill. App. 3d 833, 539 N.E.2d 801), or an engineer of the system or scheme from which plaintiff allegedly suffered harm, as in *Smith v. Central Illinois Public Service Co.* (1988), 176 Ill. App. 3d 482, 531 N.E.2d 51. However, the *First National Bank* standard based upon *Tzystuck* recognizes that a treating physician testifying to a medical opinion at trial is not an "expert witness" within the meaning of the pretrial discovery rule. (*Tzystuck*, 124 Ill. 2d at 234, citing 107 Ill. 2d R. 220.) In *Tzystuck*, the Illinois Supreme Court recognized that treating physicians typically are not retained to render an opinion at trial but are consulted, whether or not litigation is pending or contemplated, to treat a patient's physical or mental problem. (*Tzystuck*, 124 Ill. 2d at 234.) The physician's opinions offered at trial are "completely apart from the litigation" as developed in the course of treating the patient based upon his or her observations.

> "In this respect, the opinions of treating physicians are similar to those of occurrence witnesses who testify, not because they were retained in the expectation they might develop and give a particu-

lar opinion on a disputed issue at trial, but because they witnessed or participated in the transactions or events that are part of the subject matter of the litigation." (*Tzystuck*, 124 Ill. 2d at 234-35.) The record shows Dr. Cook as a "treating physician" for purposes of exemption from pretrial discovery rules for expert witnesses since he administered plaintiff's preemployment physical and, as director of defendant's medical and rehabilitation programs, evaluated plaintiff's medical records sent by Dr. Berg to determine his candidacy for the rehabilitation program. (*Cf. Kniceley v. Migala* (1992), 237 Ill. App. 3d 72, 78, 603 N.E.2d 843 (trial court improperly allowed physicians to provide opinion testimony without disclosure as experts since their sole purpose for examining plaintiff was to certify his persisting inability to work to allow his continued receipt of worker's compensation payments).) Because plaintiff was aware of Dr. Cook's involvement with his employment development with defendant, he should not have been surprised by the substance of Dr. Cook's opinion testimony and could have deposed Dr. Cook for his own purposes. See *Tzystuck*, 124 Ill. 2d at 238; see *Wakeford v. Rodehouse Restaurants of Missouri, Inc.* (1991), 223 Ill. App. 3d 31, 36, 584 N.E.2d 963 (plaintiff's witness considered a treating physician for exclusion from disclosure as an expert since plaintiff named him as a treating physician, indicated that treating physicians would testify at trial, provided defendant with the physician's records and he was deposed by defendant).

For the foregoing reasons, we affirm.

Affirmed.

TULLY, P.J., and CERDA, J., concur.