2024 IL App (1st) 230481

Fourth Division
Filed May 23, 2024

No. 1-23-0481

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| ANNETTE SANDERS, as Independent Administrator of the Estate of Joseph Sanders, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 2019 L 004599 |
| | ) ) | The Honorable Clare E. |
| CSX TRANSPORTATION, INC., | ) ) | McWilliams, Judge, presiding. |
| Defendant-Appellant. | ) | |

JUSTICE OCASIO delivered the judgment of the court, with opinion.
Presiding Justice Rochford and Justice Martin concurred in the judgment and opinion.

**OPINION**

¶ 1    This is a survival and wrongful death action brought under the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 *et seq.* (2018)) by plaintiff-appellee, Annette Sanders, the independent administrator of the estate of her late husband Joseph Sanders (Estate), against defendant-appellant, CSX Transportation, Inc. (CSX), Joseph's former employer. CSX appeals from the denial of its motion for a new trial after judgment was entered on a jury's verdict in favor of the Estate. CSX argues that a new trial is warranted where it was prejudiced by a misstatement of law in the Estate's closing argument and the trial court's instruction to the jury as to the credibility of its fact witness. We affirm.

¶ 2                              BACKGROUND

¶ 3    CSX is a corporation engaged in interstate commerce by rail and operates locomotives, railroad cars, and repair facilities. Joseph was employed by CSX as a plumber and sheet metal

worker from 2002 to 2014. He primarily worked at a large CSX train yard and operating facility known as the Barr Yard in Riverdale, Illinois. The Barr Yard consists of various buildings including repair shops and mechanical buildings. Joseph also had a lengthy history of heavy cigarette smoking. Joseph was diagnosed with colon cancer in June 2016, and he died from the cancer in March 2018.

¶ 4      In 2019, the Estate first filed a survival and wrongful death suit under FELA against CSX. In the second amended complaint, the operative pleading, the Estate alleged that during his employment with CSX and while working in its buildings, yards, and right of ways, Joseph was exposed daily to various toxins known to cause cancer, including asbestos and diesel fumes and exhausts. Specifically, the second amended complaint alleged that Joseph routinely worked in close proximity to running locomotives and other diesel-powered equipment, where he inhaled diesel fuel, and was required to install and maintain pipe systems that exposed him to asbestos dust and fibers. CSX should have known of the carcinogenicity of these toxins based on various studies, proceedings, and literature. Joseph's exposure to these toxins was cumulative and occurred at different levels over his time with CSX and caused in whole or in part the development of his colon cancer and death.

¶ 5      According to the second amended complaint, CSX had a duty to provide Joseph with a reasonably safe place to work and was required to measure the toxic substances that were released into the workplace, warn him of the dangers, and provide him with hazard control and protective equipment. CSX breached its duty to Joseph by failing to use ordinary care and caution to provide a safe workplace as required by FELA; monitor and reduce the level of toxins to a safe level; limit Joseph's exposure to toxins; provide protective equipment, proper ventilation, and exhaust systems; and warn of the risks of contracting cancer. As a result of the breaches, Joseph experienced injuries and damages.

¶ 6      CSX filed an answer denying that it was negligent and asserting affirmative defenses. In one affirmative defense, CSX alleged that Joseph's claimed injuries and damages "were caused,

in whole or in part, by pre-existing conditions, or other contributory or concurrent conditions or factors." The Estate in reply denied this assertion.

¶ 7    In preparation for trial, the Estate filed a number of motions *in limine*, including a motion under Illinois Rule of Evidence 615 (eff. Jan. 1, 2011) "to prohibit and exclude all witnesses from the courtroom during the trial proceedings except when said witnesses shall testify." At a hearing, upon the agreement of CSX, the court orally granted this motion.

¶ 8    The case proceeded to a six-day jury trial in August 2022 on the Estate's survival action only for Joseph's pain and suffering by stipulation of the parties.

¶ 9    Beginning with *voir dire*, Jason Pritchard was seated at the CSX counsel table and was introduced to the venire by defense counsel as Joseph's former supervisor. When Pritchard was deposed on March 8, 2021, he testified that he was still employed by CSX as a track supervisor, a salaried position. During discovery, William H. Bullock, Ph.D., was identified at his deposition as the corporate representative of CSX.

¶ 10    As the first witness, the Estate called Dominick Horne, its sole lay fact witness under Illinois Supreme Court Rule 213(f)(1) (eff. Jan. 1, 2018). Pritchard continued to sit at the defense counsel table throughout this testimony.

¶ 11    Horne testified that, from 2007 to 2014, he was employed by CSX as a sheet metal worker/pipe fitter and plumber. After an investigation led by Pritchard, Horne was terminated. During Horne's employment, Joseph was his supervisor at the Barr Yard, where they were the only plumbers and pipe fitters during their eight-hour shift. Their primary duties included replacing and repairing pipes that were wrapped or insulated and located within the buildings and across the yard. In doing this work, they would remove the old insulation from the pipes and replace it with fiberglass. When finished with the pipe work, Horne would sweep up the remaining debris and dust. He did not wear a mask or a respirator.

¶ 12    Horne recalled one occasion when he and Joseph were in the loft of the track department building and preparing to run pipes to an ongoing addition to that building. Joseph became alarmed when he saw what he thought was asbestos. Joseph told Horne he would ask Pritchard "what they

were going to do about the issue." Horne did not know whether Joseph in fact informed Pritchard about the asbestos, but he later observed an asbestos removal crew at the track department building.

¶ 13 Horne saw pipes with the same type of insulation in the engine house where the locomotives were repaired. Joseph and he worked in the engine house on a daily basis. At the same time, other employees were maintaining locomotives. Up to four locomotives could fit in the engine house, and more than one locomotive would be running when he and Joseph were working there. The running locomotives created diesel exhaust, which he could see and smell. The engine house was "filthy," with soot everywhere, and was later condemned and closed. Joseph and he were also exposed to diesel fumes while working in other parts of the Barr Yard. For example, they would climb the sand tower and work above the running locomotives on the ready track. Joseph told Horne that he had worked in every building in the yard.

¶ 14 According to Horne, CSX regularly provided safety training but not on "asbestos in the workplace," the dangers of diesel exhaust, or the use of masks and respirators. There were no asbestos warnings on pipes and masks, and respirators were not available.

¶ 15 The Estate next called Pritchard as an adverse witness. During his testimony, Pritchard revealed that he was no longer employed by CSX after working there from 2009 to 2020. CSX was reimbursing him for his time in court.

¶ 16 Pritchard became a supervisor in 2010 with the title of facilities manager and oversaw the Chicago region of CSX. In his role, Pritchard traveled throughout his assigned territory and was not at the Barr Yard every day. He supervised both Joseph and Horne. Horne worked with Joseph but was not supervised by Joseph. They were to notify him of any safety concerns. He did not recall Joseph reporting an asbestos issue. Pritchard agreed that Joseph worked around asbestos and that asbestos was not labeled. There was asbestos-lined piping in the Barr Yard. CSX protected employees by training them to identify asbestos and then not "disturb it." Employees were also trained to stop work and notify a supervisor if they believed there was asbestos at the site. There was no training on diesel exhaust.

¶ 17    When examined by counsel for CSX, Pritchard explained the "regimented" safety programs for CSX employees. Safety training was done annually, monthly, and quarterly, and there was a safety briefing each morning. As a manager, he attended the trainings with the employees under his supervision, including Joseph and Horne. An annual environmental certification program included asbestos management policy and the use of respirators. There is no reasonable concern when asbestos is intact and not disturbed. Employees were told to stop work and report to their managers if they thought there was asbestos that was disturbed or damaged. CSX employees were not permitted to remove the pipe insulation.

¶ 18    Pritchard testified that, when the track department building was being renovated, the contractor notified CSX that the pipes were safe to remove without abatement. The floor tiles in the building were found to need asbestos abatement.

¶ 19    He never assigned Joseph or Horne to do work in the engine house. From the time Pritchard started at CSX in 2009 through 2014, when Joseph stopped working at CSX, the engine house was not operational and in any event was not under his management. The engine house was later remodeled and reopened. The Halsted and Ashland towers were also nonoperational and boarded up when Pritchard joined CSX. Those buildings did contain asbestos. Pritchard asserted that Joseph would have been working outside in the yard a large part of the time and not inside the buildings.

¶ 20    After Pritchard's testimony, outside the presence of the jury, the trial court expressed concern that Pritchard had been at the defense counsel table as the corporate representative through Horne's testimony when he was no longer employed by CSX. The court believed that Pritchard's presence had defeated the order excluding witnesses from the courtroom and that the jury had seen him speaking to defense counsel during the proceedings. CSX counsel explained that Pritchard was a "table representative" as Joseph's supervisor and he did not need to be a current employee; this practice was common in railroad cases. The court adjourned for the day, indicating that the issue would be further discussed.

¶ 21    On the next day, the parties presented memoranda and argument to the court addressing the propriety of Pritchard sitting at the defense counsel table. The Estate argued that it was unaware that Pritchard was no longer a CSX employee and that he could not be the corporate representative and in the courtroom during testimony. The Estate requested as relief that the court strike Pritchard's testimony, allow its expert witness to be in the courtroom and hear the testimony of Bullock, or give a curative instruction to the jurors that would explain what happened and allow them to "weigh it." CSX continued to maintain that it had done nothing improper by having a former employee represent CSX. During the discussions, the parties agreed that Pritchard would not be recalled as a witness, and the court allowed him to remain in the courtroom but not at the defense counsel table. When the court expressed a view that allowing the Estate's expert to sit in the courtroom during Bullock's testimony would be problematic, the Estate withdrew that request. The court took the other requests to strike Pritchard's testimony or give curative instructions under advisement. The court did decide to instruct the jury at that time that attorneys are allowed to speak to witnesses and that the jurors were the sole judges of the credibility of the witnesses. When the trial resumed, the court gave those instructions without objection.

¶ 22    The Estate then called Bullock, CSX's director of occupational health and safety, as an adverse witness. He has been employed by CSX since 2007. CSX identified him in this case both as a corporate designee with the ability to bind the company and as its expert in industrial hygiene.

¶ 23    Dr. Bullock explained that industrial hygienists assess and protect workers from potential risks due to chemicals and physical or environmental agents based on medical sciences and engineering studies. Before coming to CSX and since 1986, he developed experience in asbestos and respiratory protection and is a certified asbestos inspector. Bullock explained that the Occupational Safety and Health Administration (OSHA) has set an employee's permissible exposure limit (PEL) to asbestos as 0.1 fibers per cubic centimeter for eight hours a day, five days a week, 52 weeks a year for a work lifetime. The short-term exposure limit (STEL) is "a 30-minute excursion limit" of one fiber per cubic centimeter. An employee can be exposed to the STEL a few

periods a day as long as the eight-hour average is still below 0.1 fibers per cubic centimeter. Employers are required to ensure their facilities meet these limits.

¶ 24    Asbestos is dangerous when it is in a "friable" state, meaning "it can be crumbled or reduced to powder by hand pressure." If there is asbestos present in a building, abatement must be done prior to renovation or demolition.

¶ 25    He is familiar with the Barr Yard and has been there on five or six occasions for inspections, the last time being in 2015 or 2016. He never inspected the engine house. His qualitative assessments of the Barr Yard gave him no reason to do quantitative assessments such as testing of the air in relation to the plumbers and pipe fitters. In his professional judgment there were no potential risks to these employees. Joseph would have been working outside for the most part and did not have the same exposure as employees in the shops. During the time Joseph was working for CSX, there were some buildings in the Barr Yard that had "friable pipe wrapping" or other asbestos-containing material, but most of the buildings were "asbestos-free." He referred to studies of air sampling at the Barr Yard with no test results indicating "exposure even close to the PEL." Further, the engine house at the Barr Yard was closed, which meant Joseph and Horne could not have been working in there. Further, CSX has a rule that locomotives cannot be run inside buildings.

¶ 26    Bullock testified to the opinions that he reached as to this case. First, CSX provided Joseph with a safe workplace that was free of recognized hazards and met or exceeded the standards for being a reasonably safe place to work. Second, there were no known environmental agents encountered by Joseph at work that posed a potential risk to developing colon cancer. Next, Joseph's potential exposure to asbestos would have been "trivial" or low-level. Finally, Joseph's potential exposure to diesel fumes was well below published safe levels. He was not overexposed to asbestos or diesel exhaust, and his work environment did not contribute to his health conditions.

¶ 27    Hernando Perez, Ph.D., a board-certified industrial hygienist, testified as an expert for the Estate. He is a lead industrial hygienist and environmental hygiene program manager for the federal government and does consulting work for the law firm representing the Estate. As the

consultant on this case, he reviewed relevant documents and records and the depositions of Horne, Pritchard, and Bullock and spoke to Horne by phone. Perez then prepared reports and reached opinions. Generally, after his review, he believed that "there was asbestos in friable condition in [the] Barr Yard that was not being what we call managed in place."

¶ 28    During his testimony, he described CSX reports beginning in 1991 that identified asbestos-containing material in various buildings in the Barr Yard, including thermal insulation around pipes. A 1991 report showed thermal insulation around pipes in the track department building. Plumbers should be notified of the existence of friable thermal insulation in the Barr Yard before they work in the spaces. There was a reduction in the number of pipes with thermal insulation over the years, which Perez believed was the result of plumbers replacing the pipes and not by abatement.

¶ 29    The OSHA general duty clause requires employers to provide "a safe and healthful working environment." [1] He believed CSX violated this duty in several ways. Joseph's work in the engine house would have exposed him to diesel fumes, which were carcinogenic, at high unsafe levels. Perez opined that, when Joseph and Horne cut through the thermal insulation when repairing or replacing pipes and swept up the debris and dust, their exposure to asbestos would have been above the OSHA STEL. He concluded that Joseph and Horne had these high-level exposures to asbestos two to three times a month for years. CSX also should have provided Joseph with respirators but failed to do so.

¶ 30    Steven Newman, M.D., a physician board-certified in pulmonary and internal medicine, testified as the Estate's medical causation expert.

¶ 31    He explained that there are two types of causation, general and specific causation. General causation involves the theories that epidemiologists use to determine whether certain elements or agents can cause disease. Specific causation involves a determination as to whether a substance

---

[1]    Dr. Perez referred to "OSHA" throughout his testimony without distinguishing between the Occupational Safety and Health Act of 1970 (29 U.S.C. § 615 *et seq.* (2018)) and the Occupational Safety and Health Administration that was created by that act.

caused disease in a particular individual. As to general causation, based on his review of studies by the International Agency for Research on Cancer and other literature, Newman opined within a reasonable degree of medical certainty that tobacco, asbestos, and diesel fumes are "indisputably" capable of causing colon or colorectal cancer. And as to specific causation, he concluded within a reasonable degree of medical certainty that these three substances "undoubtably" caused Joseph's colon cancer. "All three were the witch's brew, the perfect storm that killed Mr. Sanders."

¶ 32    The Estate also presented the testimony of Erik Swenson, M.D., a treating physician by videotape. Mrs. Sanders testified as to Joseph's pain and suffering.

¶ 33    CSX called Douglas Weed, M.D., Ph.D., as an expert witness in epidemiology. He follows certain prescribed methodologies in determining general and specific causation. The first condition for specific causation is that "the general causation relationship has to be established." Using this methodology and a systematic review of the literature, Weed concluded that science had not recognized that colon cancer can be caused by asbestos and diesel fumes. He opined within a reasonable degree of scientific certainty that smoking was the sole cause of Joseph's colon cancer.

¶ 34    Before both parties rested and outside the presence of the jury, the court returned to the issue of Pritchard being at the defense counsel table and present during the testimony of Horne. The court first denied the Estate's request to strike Pritchard's testimony as "draconian" relief. In deciding whether to give curative instructions to the jury to address the harm, in its role as a "gatekeeper," the court made several observations. The court found that the exception to Rule of Evidence 615 for a designated corporate representative did not apply here to justify Pritchard's presence at counsel table. The court said that Pritchard and Horne had a "seminal" relationship to the case, as their testimony was of great importance to the parties. Because it was not known that Pritchard was no longer in the employ of CSX, the Estate did not have an opportunity to object, and CSX had gained an unfair advantage by having Pritchard hear the testimony of Horne. The court believed that corporate representatives are generally "figureheads" and "take the stand for very minimal purposes and not the significant type of testimony that was given here by Pritchard." The court informed the parties that it would give the following curative instruction to the jury:

"The second witness in this case was Jason Pritchard. It was represented to you that Pritchard was a corporate representative of the defendant's CSX Corporation. We later learned, during his testimony for the first-time during trial, that he was no longer employed by CSX and left the corporation approximately two years earlier.

Had the court known this fact, Pritchard would have been excluded from the courtroom, like all the other witnesses during a trial, and would not have been able to testify about Mr. Horne's in-court testimony. You may consider this fact when evaluating the credibility of a witness."

¶ 35 Upon returning to the courtroom, the parties rested, and the court gave the curative instruction and excused the jury. CSX moved for a mistrial based on the curative instruction, which the court denied.

¶ 36 During closing argument, the Estate discussed the evidence relating to its claims that CSX breached its duties to provide a reasonably safe workplace and as to its negligence. The argument included the following discourse about the testimony of Perez:

"[THE ESTATE'S ATTORNEY:] When you violate OSHA, PEL, that's negligence. Okay? This is what's important. The FELA concept is that the railroad failed to provide Joseph Sanders with a reasonably safe place to work. That makes them negligent.

When you violate OSHA PEL, that's negligence. So what Dr. Perez focused on is not the 8-hour time weighted average over his whole career, because we can't meet that burden. We can't put Joe around asbestos.

But what he can say is there was a clear violation of the OSHA exposure limit for short-term exposures, remember the STEL limit.

And what he said was that if Mr. Sanders and Mr. Horne did what they described, what they did is they would go in there, they would have

to cut off the old insulation, they would have to replace the pipe itself. When they're done, they've got to sweep it up and get it out of there. If that took 30 minutes or more, Dr. Perez said that's an OSHA STEL violation. An OSHA STEL violation is negligence.

[CSX'S ATTORNEY]: Objection, misstates the law.

THE COURT: Overruled.

[THE ESTATE'S ATTORNEY]: It's negligence under the FELA."

The Estate went on to say that it had to prove that CSX knew or should have known about the existence of asbestos in the workplace.

¶ 37    The Estate finished its closing argument by discussing the evidence relating to causation and the contributory negligence of Joseph. Counsel explained that only if the jury found that the Estate had proved CSX was negligent and that Joseph's injuries were caused in part by CSX would it then determine damages and the percentage of contributory negligence.

¶ 38    CSX, in its closing argument, asserted that there was no evidence that it failed to comply with any government standard with respect to asbestos or diesel fumes and that it was not negligent in its training and providing a safe workplace. A main thrust of the CSX argument was that Joseph's colon cancer and death were caused solely by his long history of cigarette smoking and failure to follow medical advice.

¶ 39    In its instructions to the jury, the trial court cautioned that the law applicable to the issues was contained in its instructions and that the jury must follow the law given in the instructions. Further the jury was to disregard any statement or argument of an attorney that was not supported by the law or the evidence. The court defined negligence using the pattern instruction (Illinois Pattern Jury Instructions, Civil, No. 10.01 (approved Dec. 8, 2011)):

"When I use the word 'negligence' in these instructions, I mean the failure to do something which a reasonably careful person or entity would do, or the doing of something which a reasonably careful person would not do, under circumstances similar to those shown by the

evidence. The law does not say how a reasonably careful person or entity would act under those circumstances. That is for you to decide."

The court also instructed that, under FELA,

"whenever an employee of the railroad is injured while engaged in the course of his or her employment, the railroad shall be liable in damages to the injured employee where the negligence of any of the officers, agents or other employees of the railroad or any defect or insufficiency due to the railroad's negligence caused or contributed to cause the injury and death of the employee."

¶ 40 The jury was instructed that the Estate had the burden of establishing CSX's negligence in one of the ways claimed by the Estate, including the claim that CSX had exposed Joseph "to harmful levels of diesel exhaust and asbestos." The instructions informed the jury that CSX denied it was negligent and denied that Joseph was exposed to harmful levels of diesel exhaust or asbestos at work. Further, the jury was told that CSX claimed that Joseph was contributorily negligent in that he failed to look after his own health by smoking cigarettes and not following medical advice.

¶ 41 The jury returned a verdict in favor of the Estate but found Joseph was 65% contributorily negligent. The damage award of $2.2 million for pain and suffering was reduced to $770,000.

¶ 42 CSX filed a motion for a new trial. CSX argued that the court erred in providing the curative instruction because Pritchard was a proper representative of CSX and his presence was not prejudicial. Further, CSX contended that, in closing argument, counsel for the Estate had misstated the law when speaking of the OSHA STEL in a way that amounted to arguing for a negligence *per se* standard.

¶ 43 The court denied the motion. The court reasoned that CSX's use of Pritchard as a railroad corporate representative, given the specific facts and under the circumstances here, was an attempt to get around the order excluding witnesses from the courtroom during the presentation of evidence. The court further found that the challenged argument did not result in substantial prejudice to CSX or deprive it of a fair trial.

¶ 44    CSX timely appeals.

¶ 45                         ANALYSIS

¶ 46    On appeal, CSX contends the trial court erred in denying its motion for a new trial. We will reverse the trial court's denial of a motion for a new trial only where we find an abuse of discretion. *Vanderhoof v. Berk*, 2015 IL App (1st) 132927, ¶ 79. "An abuse of discretion occurs when a ruling is arbitrary, fanciful, or one that no reasonable person would make." *Evans v. Cook County State's Attorney*, 2021 IL 125513, ¶ 41.

¶ 47                Claimed Misstatement of the Law During Closing Argument

¶ 48    CSX first contends that it is entitled to a new trial because the Estate misstated the standard of liability under FELA in closing argument and the trial court overruled its objection to the misstatement of law. The Estate responds that its counsel was properly commenting on the evidence and that CSX was not prejudiced or deprived of a fair trial.

¶ 49    Generally, counsel is afforded much latitude in closing argument and to make reasonable inferences from the evidence. *Parsons v. Norfolk Southern Ry. Co.*, 2017 IL App (1st) 161384, ¶ 57. An improper closing argument can provide a basis for a new trial. *Lagoni v. Holiday Inn Midway*, 262 Ill. App. 3d 1020, 1034 (1994). The trial court has the initial discretion in determining whether statements made by counsel have denied a party a fair trial. *Id.* at 1034-35. For a closing argument to constitute grounds for reversal of judgment, it must be clearly improper and prejudicial. *Id.* at 1035.

¶ 50    If the trial is considered as a whole and the inappropriate closing argument did not result in substantial prejudice to the losing party or prevent a fair trial, then there is no need to order a new trial. *Davis v. City of Chicago*, 2014 IL App (1st) 122427, ¶ 84. A reversal is not necessary unless errors in the closing argument cause significant prejudice, suggesting that the outcome would have been different in the absence of the contested statement. *Id.*

¶ 51    FELA provides that a railroad carrier, while engaging in interstate commerce, shall be liable in damages to any employee for "injury or death resulting in whole or in part from the negligence

of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." 45 U.S.C. § 51 (2018). In an action under FELA, negligence is the test of liability. *Wetherbee v. Elgin, Joliet & Eastern Ry. Co.*, 191 F.2d 302, 306 (7th Cir. 1951). An employer's liability for personal injuries sustained by its workers is not absolute insurance under FELA. *Id.* The plaintiff need only prove slight negligence of the defendant to prevail on his or her claim. *Harrison v. Chicago & North Western Transportation Co.*, 264 Ill. App. 3d 857, 863 (1994). FELA does not define the elements of a claim under the statute, but it is founded on the common-law principles of negligence and injury. See *Norfolk Southern Ry. Co. v. Sorrell*, 549 U.S. 158, 165-66 (2007). To be more specific, under FELA, the plaintiff needs to provide proof of the common-law components of negligence—duty, breach, foreseeability, and causation. *Williams v. National R.R. Passenger Corp.*, 161 F.3d 1059, 1062 (7th Cir. 1998).

¶ 52    CSX maintains that the Estate informed the jury that a violation of an OSHA standard was negligence *per se* by telling "the jury—repeatedly—that any violation of an OSHA exposure limit, standing alone, 'is negligence' under FELA." In making this argument, CSX cites a line of federal cases that CSX maintains found that a violation of OSHA standards does not constitute negligence *per se* under FELA. See, *e.g.*, *Ries v. National R.R. Passenger Corp.*, 960 F.2d 1156 (3d Cir. 1992). In *Ries*, the court held that a violation of an OSHA regulation does not result in a finding of negligence *per se* nor a bar to contributory negligence in a FELA action. *Id.* at 1165. However, the court also found that a violation of an OSHA regulation may be admitted as evidence of the railroad's negligence. *Id.*

¶ 53    The comments at issue were a small portion of a lengthy closing argument. The Estate's counsel, at a point where he was discussing the testimony of Dr. Perez, referred to a violation of the OSHA PEL or STEL three times and said, "that's negligence." As the court in *Ries* found, the violation of OSHA standards was admissible as to CSX's negligence. The Estate's counsel did not explicitly say that a violation of these standards constituted *per se* negligence. In making the comments, the Estate also referred to its overriding claim that CSX failed to provide a reasonably

safe workplace. And after making the argument as to the OSHA standards relating to asbestos levels, the Estate told the jury that it must prove that CSX knew or should have known that asbestos existed in the workplace. The Estate also later discussed the evidence as to causation and told the jurors that they must assess the contributory negligence of Joseph.

¶ 54    When considered in the context of its entire closing argument, we are not convinced that the Estate made a negligence *per se* argument or that evidence of a violation of the OSHA exposure standing alone would require a finding that CSX was negligent and that contributory negligence was barred.

¶ 55    Further, we find that CSX was not prejudiced or deprived of a fair trial by any confusion or misstatement in the closing argument as to a violation of the OSHA standards. In response to the Estate's closing arguments, CSX in its closing argument maintained that it had not violated any relevant standards as to asbestos or diesel fuel, that it was not negligent in any way, and that Joseph's own conduct was the sole cause of his injuries and damages.

¶ 56    The jury was instructed that it was to disregard any misstatement of law made by the lawyers and that it must follow only the law as set forth in the instructions from the court. CSX does not raise any errors in the jury instructions. As noted above, the instructions fully set forth the Estate's burden of proof and the applicable law relating to negligence and contributory negligence for this FELA action. The jury returned a verdict that included a finding that Joseph was 65% contributorily negligent, which shows the jury did not find there was negligence *per se*. Any confusion that may have been caused by the Estate's closing argument did not result in prejudice or an unfair trial. The trial court did not abuse its discretion in denying the motion for new trial on this basis.

¶ 57                          Curative Instruction as to Jason Pritchard

¶ 58    CSX also argues that the trial court erred in instructing the jury regarding how to weigh the credibility of its witness, Pritchard. CSX specifically contends that, despite the motion *in limine* order barring witnesses from the courtroom during proceedings, Pritchard was allowed to be in the

- 15 -

courtroom under an exception in Illinois Rule of Evidence 615 (eff. Jan. 1, 2011) for a designated corporate representative. The Estate responds that the trial court acted well within its discretion in giving the curative instruction.

¶ 59    Rule 615 provides:

> "At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of *** (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney." *Id.*

The exclusion of witnesses from the proceedings "is a time-honored practice" that ensures that a witness will not shape his or her testimony to address the testimony of prior witnesses. (Internal quotation marks omitted.) *People v. Chatman*, 2022 IL App (4th) 210716, ¶ 71. While other jurisdictions—such as federal courts—consider the exclusion of witnesses to be a matter of right, in Illinois, the trial court has sound judicial discretion over witness exclusion. *Id.* ¶ 67.

¶ 60    The corporate-representative exception to Rule 615 accepts the risk associated with having witnesses present during proceedings so that corporate parties will be on equal footing with natural parties and have a representative in the courtroom. See 29 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 6245 (2d ed. April 2023 Update). But that exception applies only to "an officer or employee" of the corporate party. Ill. R. Evid. 615 (eff. Jan. 1, 2011). Some case law has held that courts have the discretion to permit former employees to be designated as corporate representatives for the purpose of the rule. See, *e.g.*, *Roberts v. Galen of Virginia, Inc.*, 325 F.3d 776, 785 (6th Cir. 2003) (finding that the trial court did not err by allowing former employee of corporation that was no longer operating to serve as corporate representative). It would follow that courts also have discretion to *not* allow former employees to serve as corporate representatives. Wright & Miller, *supra*, at § 6245 ("To the extent there is any question that a witness is exempted from exclusion under Rule 615(b), the courts have discretion to determine the applicability of that provision.").

¶ 61    The trial court made clear that its decision to give the curative instruction was based on the unique circumstances of this case and its role as "gatekeeper." First, the court and the Estate had no knowledge that Pritchard was no longer employed by CSX until he testified at the trial. As a result, the Estate had no opportunity to object, and the court had no opportunity to consider whether as a former employee Pritchard could sit at the defense counsel table or was subject to the motion *in limine* order under Rule 615. Second, Horne was the only witness for the Estate who testified to the conditions under which Joseph worked at the Barr Yard and the extent and frequency of Joseph's exposure to asbestos and diesel fuel. Pritchard, as the supervisor of both Joseph and Horne, was the only witness for CSX who could refute or limit the impact of Horne's testimony. The court found that Horne and Pritchard had great significance to the prosecution and defense of the case. After observing both witnesses during their testimony, the presence of Pritchard at counsel table, and his interactions with CSX's counsel, the trial court was in the best position to assess any harm from Pritchard being present in the courtroom, particularly during Horne's testimony. Third, Pritchard was not just a "figurehead" witness but a witness offering substantial evidence on behalf of CSX and against the Estate.

¶ 62    The court took a reasonable approach to the issue and chose the least "draconian" relief requested by the Estate. It denied the request to strike Pritchard's testimony and to allow Perez to be in the courtroom during Bullock's testimony. Instead, the court instructed the jury that it could consider the fact Pritchard had heard Horne's testimony in assessing Pritchard's credibility. The curative instruction was not given immediately after Pritchard's testimony and was not repeated when the court instructed the jury at the end of the case. The general instructions informed the jurors that they were the sole judges of the credibility of the witnesses and that each party, whether an individual or corporation, should receive their fair consideration and that the court's "rulings, remarks or instructions do not indicate any opinion as to the facts."

¶ 63    In light of the purpose of excluding witnesses during proceedings, we find the trial court did not abuse its discretion in giving the curative instruction and, in the context of the case and the

other instructions, there was no prejudice to CSX. The trial court did not abuse its discretion in denying the motion for a new trial on this ground.

¶ 64                                        CONCLUSION

¶ 65     For these reasons, we affirm the denial of the motion for a new trial.

¶ 66     Affirmed.

*Sanders v. CSX Transportation, Inc.*, 2024 IL App (1st) 230481

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2019-L-004599; the Hon. Clare E. McWilliams, Judge, presiding. |
| **Attorneys for Appellant:** | Michael A. Scodro, of Mayer Brown LLP, of Chicago, and Evan M. Tager and Carl J. Summers, of Mayer Brown LLP, of Washington, D.C., for appellant. |
| **Attorneys for Appellee:** | Stephen F. Monroe, of Marc J. Bern & Partners, LLP, of Chicago, and Jonathan Sternberg, of Jonathan Sternberg, Attorney, P.C., of Kansas City, Missouri, for appellee. |